Thomas Barton SCHALK, Appellant,

v.

The STATE of Texas, Appellee.

No. 05–86–01171–CR.

Court of Appeals of Texas,
Dallas.

Dec. 22, 1988.
Rehearing Denied Feb. 28, 1989.

John H. Hagler, Michael P. Carnes, Dallas, for appellant.

Kathi Alyce Drew, Anne B. Wetherholt, Dallas, for appellee.

Before DEVANY, McCLUNG and THOMAS, JJ.

McCLUNG, Justice.

This is an appeal from a jury trial for the theft of trade secrets. Appellant was found guilty and assessed punishment at two years confinement and a fine of $5,000, probated for two years.

Specifically, appellant was indicted under Texas Penal Code section 31.05 for knowingly making a copy of five separately identified computer programs that were the trade secrets of his employer.

Appellant contends that: 1) the evidence is insufficient to establish that the five computer programs listed in the indictment were, in fact, trade secrets; 2) the evidence is insufficient to prove that appellant knowingly committed the offense charged; 3) his motion to suppress the product of the search warrant for lack of probable cause should have been sustained; 4) the evidence was the product of an impermissible general exploratory search; 5) the seizures were not made pursuant to the authority granted under the search warrant, and 6) jury misconduct occurred. Having found no error, we affirm the judgment of the trial court.

## FACTS

The complainant, appellant's former employer, is a major corporation with worldwide facilities and engaged primarily in the electronics industry in various capacities. This case involves a computer programming area sometimes referred to as speech synthesis, or voice recognition. It can be described in an oversimplified manner as a computer software program that causes a device to respond in a specified manner to commands issued orally or by voice. The complainant is generally understood to be a pioneer in this field and an industry leader in the research and development of this type of programming for various applications.

The complainant kept and maintained a facility on their premises in Dallas designated as the "speech research laboratory" where this type of programing, research and development was conducted. Appellant had been employed by the complainant for approximately twelve years as an engineer in the speech laboratory. The laboratory was kept physically separated from other facilities within the confines of the overall premises. Access to the laboratory was limited to only certain authorized personnel, estimated to be something less than one hundred out of the several thousand that were admitted daily through the gates of the fences around the perimeter. The exterior gates were monitored by security guards around the clock. Speech laboratory employees were required to wear a certain type identity badge to gain access to the laboratory. Appellant, as an employee in this speech laboratory, was provided with the appropriate identity badge and was one of the limited group of employees granted access to the laboratory.

While so employed, appellant was under the direct supervision and authority of the Branch Manager of the Speech Research Laboratory. This branch manager was also known as the Chief Speech Scientist. Over the years of appellant's employment, his relationship with the department head became somewhat informal; however, the branch manager was appellant's immediate superior, and appellant always received all

job assignments from the Chief Speech Scientist and was responsible directly to him. Appellant's immediate superior had been associated with the complainant company for many years prior to appellant's employment and, as Chief Speech Scientist, had originally written many of the programs utilized in the research conducted in the speech laboratory. Part of appellant's primary job assignment was to modify or convert certain portions of those original programs so as to accomplish a specific result, such as producing sounds from a speaker rather than a visual output displayed on a video screen, on receipt of an oral command. The final product, while perhaps producing a different result, was primarily made up of the basic original program that had been previously developed and carefully preserved as confidential by the complainant company.

These programs were stored in a memory bank of a computer system in the speech laboratory. Appellant was allowed access to these programs through a code or password specifically assigned to him. The password or code assigned to an employee in the laboratory was personal to that employee and was assigned only if their job duties required access to the information and any of those confidential programs stored in the memory bank. Essentially, access was permitted on a "need to know basis" as it related to their duties. Only by the proper use of his assigned password or code could appellant withdraw information from a memory bank and into a computer terminal. Appellant could also call data from the memory bank into a computer terminal located off of the complainant's premises via telephone modem, with the right kind of computer equipment and the use of his personal password. On certain occasions, persons from outside the company were assigned a guest/user password or code so as to allow access to the computer within the laboratory. This decision and assignment, however, was made by persons within the company other than appellant, and appellant was not consulted or involved in such a decision.

As was customary with all laboratory employees, appellant had a "directory" designated as his and identified as such. Appellant's work product was saved or stored under this directory in the memory bank of the computer in the speech laboratory. Appellant also could, and did, store other data, programs and information in this same directory, some of which was personal to him. The speech laboratory computer equipment had the capability of receiving from, sending to, or copying to another medium, such as magnetic tape, any information stored in the memory when the appropriate instructions or commands were entered. Whenever a computer memory was accessed, the date, time, and identification of the user and the terminal was automatically logged into the memory. Appellant was experienced and very sophisticated in the use of this equipment and was a top level employee in the laboratory, working at a computer terminal regularly on a full time basis.

Appellant resigned his position with the complainant company to take a position as a vice-president with another company that also engaged in voice recognition and speech synthesis research and development. Although this new company was much smaller in overall size and scope and said to be utilizing a different method or system, the new employer was in fact a direct competitor of the complainant in the area of voice control technology. Appellant's background, knowledge, and experience in this field was a major factor in making the new job available to him.

Over a period of a few years, several other speech laboratory personnel had left the complainant's employment to take positions with this same new employer, primarily because their specialized knowledge in this field gave them unique qualifications that competitive companies would seek out. One such employee had occasion to see some information stored in the memory of the computer he was using on his new job that he believed he recognized and he thought belonged to his former employer, the complainant. Feeling something was amiss, this employee contacted complainant's company security to report what he had seen. (This informant acknowledged

that he felt that he had been wrongfully terminated previously by the complainant and that he hoped that bringing this information to the complainant's attention would help get his old job back.) A series of meetings between security personnel and the informant took place and during these meetings, additional information was delivered. The informant was also recruited to act as a "mole" to search his employer's premises and equipment for further information or like material. The mole took several photos of various offices and their contents and made copies of some documents he thought belonged to the complainant and contained sensitive material. One of the photographs taken in appellant's office revealed a shelf containing one or more magnetic tapes of the type used to store computer data. Although the contents of the tapes were unknown at that time, at least one of them bore a label with the names of certain programs which the mole recognized from his former employment and job assignments with the complainant.

The information from the informant was passed along through the complainant's corporate structure, and an internal investigation within the speech laboratory took place. From the automatic entries made when the computer memory was accessed, the complainant determined that only a few hours before appellant left complainant's employ, a copy of the entire directory assigned to appellant was made onto a magnetic tape by someone using the personal access code assigned to the appellant. Imbedded within that directory and the information copied onto that tape from that directory were programs identified by the complainant to be trade secrets. Among these were the five programs that were ultimately made the subject of this indictment.

Armed with this information, complainant contacted the District Attorney. A search warrant for the premises of appellant's employer was obtained and executed shortly thereafter. During this search, the tape in question was among the items seized from appellant's office. Examination of the data recorded on the tape using compatible equipment revealed that it did, in fact, contain the five programs listed on the indictment. Appellant was arrested at the time the search warrant was executed at his place of employment.

Appellant does not dispute the fact that he did copy the directory that had a plethora of data recorded on it, or that the programs on the indictment were included, or that he took the tape with him when he left complainant's employ.

## TRADE SECRET

■ Section 31.05(b)(2) of the Texas Penal Code, entitled "Theft of Trade Secrets," provides:

A person commits an offense if, without the owner's effective consent, he knowingly makes a copy of an article representing a trade secret.

Section 31.05 defines a trade secret in subsection (a):

"Trade secret" means the whole or any part of any scientific or technical information, design, process, procedure, formula or improvement that has value and that the owner has taken measures to prevent from becoming available to persons other than those selected by the owner to have access for limited purposes.

To be a "trade secret" within the clear meaning of this section, the information, design, process, procedure, formula or improvement must not only be a secret, but must also be generally unavailable to the public and it must give one who uses it an advantage over competitors that do not know of or use the trade secret. A fair reading of this section suggests that to qualify as a "trade secret", the article in question must meet a three prong test:

1) Be all or part of scientific or technical information,

2) Be of value to the owner,

3) Be protected by measures taken by the owner from access, except those selected by the owner for limited purposes.

Appellant does not contest the first two prongs of the test, that is, the fact that the programs are a "part of any scientific or technical information ..... that has value...." Rather, he asserts in his first point of error that the evidence is insufficient to support the third prong: He contends that the complainant failed to designate the computer programs as trade secrets or prevent access to the computer where this information was stored; therefore, the complainant did not take measures to prevent access to them. Appellant argues that the programs in question were not trade secrets at the time he made the copy, or, if they had been, they had lost their status as trade secrets because the complainant had not protected them. Clearly, if an article that is a trade secret becomes known to the community, it loses its status as a trade secret. *Furr's Inc. v. United Specialty Advertising Co.*, 338 S.W.2d 762, 765 (Tex.Civ.App.—El Paso 1960, writ ref'd n.r.e.). However, a limited disclosure to others pledged to secrecy will not destroy the trade secret's status as such. *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1200 (5th Cir.1986). There is no question but that appellant was one of the limited persons that had been granted limited access to this information since his job function required him to work with this data on a regular basis. We must determine, therefore, if the data was ever a trade secret and, if so, whether it had lost its status as such for some reason at the time it was copied by appellant.

Appellant points out that several persons had been granted guest/user codes, including a summer intern who was allowed to utilize the laboratory equipment to write his college thesis. That intern testified, however, that he felt the information and codes entrusted to him were a secret and were not to be disclosed. Appellant argues that access could be gained through use of a telephone modem, but recognizes that it took the right kind of computer and user password to do so. Appellant claims that his superior, the Chief Speech Scientist and Branch Manager of the Speech Research Laboratory, had made a ten minute presentation at a seminar where he discussed the "concepts" involved concerning the series of programs listed on the indictment. Although concepts were briefly discussed, the algorithms used in the creations of the programs were not mentioned or disclosed. Appellant further maintains that certain data base programs were released to the National Bureau of Standards to aid them in establishing an industry standard. These programs were unrelated to those in the indictment. Appellant further argues that data was released to a university engaged in similar research. This release was only under a nondisclosure agreement. Appellant insists that the internal procedures manual provided to all employees set out the manner that trade secrets were to be identified and handled and these programs were not so identified. Significantly, the basic programs from which the items in question were derived were, in fact, listed in the Trade Secret Register kept by the complainant. While appellant points out certain areas that he feels show complainant's weaknesses in the security of the information, he presents no evidence to suggest that any of the series of programs in the indictment had ever been released to anyone outside the speech laboratory. The complainant vigorously and steadfastly denied that any of these programs and the algorithms had ever been published or given out to anyone and that none of complainant's speech recognition, speech synthesis, speaker verification, or voice verification software had ever been released nor had anyone ever been authorized to do so. Finally, appellant admitted that he had personally told fellow employees that such programs had not been given out.

It is an axiom in our jurisprudence that when interpreting a statute, we should start with the statute itself. A statute must generally be construed according to the fair import of its terms, and with a view to effect its objects and to promote justice. The plain meaning of words used in a statute is not to be disregarded *Casillas v. State*, 733 S.W.2d 158, 163 (Tex.Crim. App.1986) cert. dismissed at — U.S. —, 108 S.Ct. 277, 98 L.Ed.2d 238 (1987); *Cam-*

*pos v. State,* 623 S.W.2d 657, 658 (Tex. Crim.App. [Panel Op.]—1981); *Ramos v. State,* 419 S.W.2d 359, 364 (Tex.Crim.App. 1967). We must assume that the Legislature meant the section to be read as it was written and we cannot create an offense by enlarging on, or inserting or deleting words, nor should we do so by giving false meaning to its words. *State ex rel. Vance v. Hatten,* 600 S.W.2d 828, 830 (Tex.Crim. App.1980).

■ Turning to the statute, the pertinent portion reads *"that the owner has taken measures to prevent from becoming available to persons other than those selected by the owner...."* This statute does not deal with the degree or extent to which an owner must go to protect a secret but simply specifies that for it to be an offense to copy information without the owners' permission, the owner must have taken some measures to protect the information from unauthorized disclosure. Although appellant's attack is directed more toward the type, degree, or extent of the measures taken to protect the data than it is toward the question of whether the "... owner has taken measures ..." we, nevertheless, will treat this point as one of factual insufficiency and address the record under that standard.

The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307 at 319, 99 S.Ct. 2781 at 2789, 61 L.Ed.2d 560 (1979). This standard is applicable to both direct and circumstantial evidence cases. *Taylor v. State,* 684 S.W.2d 682, 684 (Tex. Crim.App.1984).

This voluminous record is replete with evidence detailing the strict security measures taken by the complainant to prevent any and all information emanating from the speech laboratory from falling into the hands of unauthorized persons. All employees, including appellant, signed nondisclosure agreements when hired. This was a necessary condition of the employment of the appellant. Various applications of iden-

tification badges were provided to all employees and these badges had to be displayed at all times and places while on or about the premises. Different levels of security were applied to different areas and the badges carried features to delineate whether a particular employee was cleared to enter a particular area. The full time security guards, regular employees, receptionist, and so forth, were required to remain alert for anyone they might observe without a proper identification badge for a particular section or area. Visitors were subjected to sign-in procedures and were provided escorts and special identification badges. The entry gates were manned by security guards. Security guards were stationed in selected locations, and closed circuit television monitors were used throughout the building. Entry to the speech laboratory was limited to only a very small segment of the total employee population, and was contained in a separate wing or building and isolated with security doors from other areas. Within this area, all print-outs or hard copies of any data were kept put away. Night time security checks were made for data left out on desks. In the event any documents were seen by security personnel during routine off-hour inspections, they were put away and the incident made the subject of a report. Appellant was assigned a password or access code which allowed limited access to some information stored in the computer memory but other data stored in restricted directories was not available. Any access at all required certain code clearance or password information to be given before the computer would respond. A highly confidential Trade Secret Register was kept and maintained as a permanent record in the legal department which contained reference to the "speech processing" programs being utilized in the laboratory. Employees in the laboratory were given an admonition that they were to protect any software programs being used, developed, or being researched by the laboratory. In addition, an "exit" interview was conducted with any employee whose job involved sensitive proprietary and confidential information by a member of the Legal Department

staff for the specific purpose of re-emphasizing their non-disclosure responsibility upon termination.

We conclude that these facts are sufficient for this jury, as a rational trier of fact, to find beyond a reasonable doubt that these elaborate security precautions were taken by the owner/complainant to protect its information, that such information was secret and intended by the owner to remain so. Having determined that the evidence is sufficient to meet the test of "measures taken by the owner to protect", we hold the programs listed in the indictment were trade secrets as defined in Texas Penal Code section 31.05(a). Appellant's point of error number one is overruled.

## KNOWLEDGE

■ In his second point of error, appellant maintains that the evidence is insufficient to prove that he "knowingly" made copies of trade secrets. Appellant having admitted that he made the copy, and our having previously held the items to be trade secrets, we then come to the question of whether appellant "knew" the items were trade secrets when he made the copy, thus that he acted knowingly as set out in Texas Penal Code section 31.05(b)(2). The necessary culpable mental state is described in Texas Penal Code section 6.03(b) thusly:

> A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

TEX.PENAL CODE ANN. (Vernon 1974).

Evidence in regard to a culpable mental state must be viewed in the light most favorable to the verdict. *See Humason v. State*, 728 S.W.2d 363 (Tex.Crim.App.1987). Absent a confession, proof that appellant acted knowingly must be based on circumstantial evidence. *Dillon v. State*, 574 S.W.2d 92, 94 (Tex.Crim.App.1978). Being mindful of the above and the standard of review of factual insufficiency claims as set out above, we again turn to the record.

Because appellant had been a full time, high level employee in the speech laboratory for twelve years, he had been subjected to the elaborate security precautions implemented by his employer every day. The controlled physical access to the plant through the use of guards, employee identification badges, visitor escorts and special sign-in procedures, confidential materials kept locked up or destroyed when no longer needed, closed circuit television monitoring, and the necessity of the regular use of secret identity codes on the computer all served as a constant reminder of the restricted environment in which appellant worked. Appellant signed a nondisclosure agreement when he was hired. He discussed the need for secrecy and the nature of the confidential aspects of their work with his immediate superior and fellow employees on a regular basis during his employment. Periodic staff meetings were held where the nature and progress of their work was discussed and the subject of much of the discussions was the secret and confidential aspects of work appellant and his fellow employees were doing. The value of work and how it did or would affect the complainant's competitive position in the general market place was a significant factor discussed in the regular staff meetings.

Appellant, during his testimony at trial, stated that it would have taken hours to have gone through the numerous programs and data in his directory to selectively pick out items for copying, so in the interest of time, he intentionally entered the commands that would copy all files in the directory, knowing that all files would be copied. He further stated that he had worked on the files that were in his directory and was familiar with them and what they were, but that he did not consider them to be trade secrets; that they were not so marked or designated in the computer and that they were readily accessible to him.

Significantly, appellant not only copied his own entire directory, but also copied

one other directory called the "speech utility" directory. He did so very close to his last day on the job, and used his secret identity code to gain access to all of this data for copying. In his exit interview, which took place as one of the last official events on the job, he signed a document titled Trade Secret Listing for Termination of Employment where he acknowledged that his nondisclosure responsibility and the confidentiality of his work was discussed. Appellant testified he felt he had a right to copy and take anything he was interested in because he never had any intention of using this information. The issue of whether the data and information in question was wrongfully used is not before us. There was also testimony that during the time appellant was in the employ of the new company, he was heard to make reference to items belonging to the complainant as the "stolen data base" and the "stolen files," on a periodic basis.

We hold this evidence is sufficient to support the finding by the jury that appellant knowingly made copies of protected programs that were of value to his employer. Appellant's second point of error is overruled.

### *SEARCH AND SEIZURE*

Appellant next maintains that his pretrial motion to suppress the evidence obtained through the search warrant should have been sustained because the magistrate did not have a sufficient showing of probable cause to issue the warrant. In support of his argument, appellant claims violation of the Federal Constitution, State Constitution, and state laws. We will address the constitutional and statutory consideration independently.

Both the fourth amendment to the Federal Constitution and the Texas Constitution guarantee that "the people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation." TEX. CONST. art. I, § 9. In interpreting the fourth amendment, the Supreme Court has held that an affidavit is sufficient in establishing probable cause if, from the totality of the circumstances reflected in the affidavit, a reviewing court can determine that the magistrate was provided with a substantial basis for concluding that probable cause existed. *Illinois v. Gates*, 462 U.S. 213 at 238–39, 103 S.Ct. 2317 at 2332, 76 L.Ed.2d 527 (1983). In *Gates*, the Supreme Court criticized the application of the "two-pronged" test to determine whether probable cause exists that had evolved from *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), stating that although the veracity and basis of knowledge of an informant are highly relevant factors in determining the value of an informant's report:

> "These elements should not be understood as entirely separate and independent requirements to be rigidly exact in every case. (103 S.Ct. at 2328). [462 U.S. at 230, 103 S.Ct. at 2328]
>
> \* \* \* \* \* \*
>
> ... The Task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of the reviewing court is simply to insure that the magistrate had a 'substantial basis for ... conclud[ing]' that probable cause existed.... (103 S.Ct. at 2332). [462 U.S. at 238, 103 S.Ct. at 2332]

*Hennessy v. State*, 660 S.W.2d 87, 89 (Tex. Crim.App.1983).

█ The question then arises as to whether the Texas Constitution establishes a higher threshold of probable cause standard for the issuance of a search warrant than that required by the fourth amendment. We hold that it does not. The language of article 1, section 9 of the Texas

Constitution is substantially the same as that used in the fourth amendment of the United States Constitution. Accordingly, the same rationale underlying the opinions construing the Federal Constitution applies with equal force to the Texas Constitution. Because of the identical language, article 1, section 9 cannot be independently read to establish a greater probable cause standard than that provided by *Illinois v. Gates.*

In *Brown v. State,* 657 S.W.2d 797, 799 (Tex.Crim.App.1983), Judge McCormick, writing for a plurality, observed that the Court of Criminal Appeals "has opted to interpret [the state] constitution in harmony with the Supreme Court's opinions interpreting the Fourth Amendment. A majority of that court adopted the view of the *Brown* plurality and held valid the search of an automobile passenger compartment in reliance upon the decisions of the Supreme Court interpreting the fourth amendment in *Osban v. State,* 726 S.W.2d 107 (Tex.Crim.App.1986). Further, the Court of Criminal Appeals has applied the "totality of the circumstances" analysis in determining the validity of a search warrant for probable cause under the Texas Constitution, and the appellate courts have followed the direction of the Court in the application. *See Hennessy v. State,* 660 S.W.2d 87 (Tex.Crim.App.1983); *Correll v. State,* 696 S.W.2d 297 (Tex.App.—Fort Worth 1985, pet. ref'd); *Andrada v. State,* 695 S.W.2d 230 (Tex.App.—Corpus Christi 1985, no pet.).

■ TEX.CODE CRIM.PROC.ANN art. 18.01(b), (c) (Vernon Supp.1986) states:

(b) No search warrant shall issue for any purpose in this state unless sufficient facts are first presented to satisfy the issuing magistrate that probable cause does in fact exist for its issuance. A sworn affidavit setting forth substantial facts establishing probable cause shall be filed in every instance in which a search warrant is requested.

(c) A search warrant may not be issued ... unless the sworn affidavit required by Subsection (b) of the article sets forth sufficient facts to establish probable cause: (1) that a specific offense has been committed, (2) that the specifically described property or items that are to be searched for or seized constitute evidence of that offense or that a particular person committed that offense, and (3) that the property or items constituting evidence to be searched for or seized are located at or on the particular person, place or thing.

Of particular relevance is *Elliott v. State,* 687 S.W.2d 359 (Tex.Crim.App.1985), upholding the Houston Court of Appeals in applying the totality of circumstances analysis under both the Texas Constitution and the Texas Code of Criminal Procedure article 18.01.

Accordingly, such application of the "totality of the circumstances" standard of review to review an affidavit under the Texas Constitution and article 18.01 of the Texas Code of Criminal Procedure is correct. We will determine the validity of this search warrant in the instant case under the "totality of the circumstances" analysis, recognizing there is no magic formula for stating the necessary information, and understanding that we must interpret the affidavits in the same common-sense, realistic manner as the magistrate, drawing reasonable inferences from the facts contained therein.

■ Applying the law to the facts before us, the affidavit for the search warrant is based on what five informants told the affiant, a special investigator with the specialized crime division of the District Attorney's office, and not on the affiant's personal knowledge. Two of the informants were security personnel of the complainant, being Vice-President of Safety and Security and the Regional Security Manager, respectively. Two others were the Branch Manager of the Speech Research Laboratory, appellant's immediate superior, and the Branch Manager of the Central Research Laboratory Computer Facility. The fifth informant was the employee (mole) of the other company that made the original report.

The affidavit sets out in detail that the affiant first talked to informants A and B, the security personnel, and was advised by

these informants that they had been contacted by informant C, a former employee, and learned from informant C that within the two weeks previous, certain officers and employees of his current employer had possession of computer software, proprietary information and data relating to research in the field of speech recognition; that informant C had personally seen magnetic tapes, bound manuals and documents bearing the complainant company's name and marked "classified", "strictly private", "Property of \_\_ \_\_ ONLY", and "Speech Recognition Task Force, Final Report, July 1981" which was marked "Strictly Private". They further advised affiant that informant C had, on his own initiative, removed a number of documents he had seen and given them to informants A and B, and that these documents had been identified as belonging to complainant; that informant C had made print-out copies of various computer directories and computer files from the computer at his place of employment which had been delivered to them and these documents had been identified as containing confidential data belonging to complainant; informants A and B also told him that the duties of appellant, at the time of his leaving the complainant's employment, included research in the field of speech recognition under the supervision of informant D, and that appellant had signed a "Trade Secret Listing for Termination of Employment" in which appellant acknowledged being advised concerning disclosing proprietary information or trade secrets.

Affiant was told by informant C, who was at that time employed in the same company as appellant, that certain officers and employees, including appellant, had possession of computer software, proprietary information and data relating to the field of speech recognition; that these officers and employees had recently made reference to the "(complainant's) files" in informant C's presence and that appellant was currently engaged in converting complainant's software to (competitor's) software; that informant C had personally observed and photographed six magnetic tapes of a certain brand and bearing labels that suggested to informant C they were the property of the complainant; further, that he had personally observed and photographed certain manuals in appellant's office bearing complainant's logo; that informant C had delivered to the affiant prints of the photographs and the documents, and examination by the affiant showed those items to be as observed by this informant; further, informant C made a print-out (hard-copy) of three computer files stored in the computer, also delivered to and viewed by the affiant, one of which contained the language "Modified 4–19–85 by (appellant) to handle both (new company) files and (complainant) files. Additionally, informant C made and delivered to affiant a printed copy of the "directory" of all programs carried on his employer's computer under appellant's name which showed a creation date prior to appellant leaving complainant's employment; the programs listed on this directory were identified by informant D as being eitherextremely similar to, or identical to, in many cases, complainant's directory listings and the creation dates on the vast majority of programs were identical to the creation dates of complainant's programs and predated appellant's termination with complainant; all of which affiant personally examined and determined they did contain the information as represented.

Informants D and E told the affiant that their personal examination of the documents, print-outs, and data provided by informant C revealed that they were the property of the complainant and that it was proprietary and contained trade secrets which had been developed from years of research at very substantial expense and, if released, would cause extensive loss and harm to the complainant's future market share; and further, that appellant had been made fully aware and acknowledged to them in writing that any release or revelation of this information to anyone outside complainant's company was strictly forbidden because it was considered a trade secret. Informants D and E also confirmed the credibility of informant C, verifying his ability to recognize such trade secret data

from his experience in the field of speech recognition and prior employment with complainant.

Interpreting this affidavit in a common-sense, realistic manner and drawing reasonable inferences from the facts contained therein, we hold that this search warrant was based on probable cause. Appellant's point of error three is overruled.

■ We now turn to whether the search warrant described the things to be seized with particularity, as required by section 9 of article 1 of the Texas Constitution, or whether it was overly broad. Appellant argues that his motion to suppress the seized evidence should have been sustained because it was the product of a general exploratory search. We disagree. The requirements for a sufficiently particular description can vary according to the thing being described. *Walthall v. State,* 594 S.W.2d 74, 78 (Tex.Crim.App.1980). Appellant relies heavily on *United States v. Klein,* 565 F.2d 183 (1st Cir.1977), where the warrant was held to be in violation of the Fourth Amendment of the United States Constitution because the affidavit provided the magistrate with only a generic description of "pirated" reproductions of copyrighted recordings on electronic 8-track tapes, and failed to provide a method whereby the officer could differentiate between contraband and legitimate inventory in the defendant's store.

■ The *Klein* holding is different from the present case in two important respects. First, the *Klein* warrant did not reveal with any degree of certainty that legitimate or authorized tapes would not be seized. Second, in *Klein* there was no specific and detailed foundation for a belief that a large collection of similar contraband was present on the premises which would serve to reduce the level of particularity required. In the case before us, the affidavit specifically described the items considered to be contraband by the labels on magnetic tapes, identifying titles on documents and manuals, supported by photographs of their exact location and identity and the personal observation by the infor-

mant. The search warrant itself states that the officers were to search for:

> magnetic tapes containing active data, and the corresponding archive tapes and backup tapes; removable disks containing active data, and the corresponding archive tapes and/or disks and backup tapes and/or disks; and fixed disks containing active data, and the corresponding archive tapes and/or disks and backup tapes and/or disks; and specifically including five (5) magnetic tapes bearing the brand name "quadronix 1", and respectively being labeled "SPDIR.BCK", "SPRGL.BCK", "SPGD.BCK", "DRAFT. BCK", and "Label: ADDR Copy used"; and

> all documents and other written materials containing, in whole or in part, "trade secret" information and/or data and/or files ... notebooks, pamphlets, instructions, summaries, manuals, correspondence, memorandums, papers, file listings, file directories, and file dumps, including all such documents marked "_____ _____ Strictly Private" or "_____ _____ Classified;"

The fourth amendment and the Texas Constitution and statutes do not require a minute and detailed description of the property to be seized, but the property must be so definitely described that the officer making the search will not seize the wrong property. The description should be sufficient to direct the officer which articles to select for seizure the described from the generally inoffensive, and not confer free-wheeling discretion upon the officer.

We have a fact situation where the officer is directed to search for a unique set of articles, that by their very nature can only be known to or recognized by a very select and limited group of persons. The matter is further complicated by the fact that the "trade secrets" made subject of the search warrant could, and in this case did, take several forms: written documents, computer print-outs (hard-copy), magnetic tape recording, or any other type of digital storage media. The specifically labeled magnetic tapes and the printed documents and manuals bearing clearly visible identifying

ownership labels which contained "trade secrets" were set out in the affidavit and warrant. To describe the "trade secret" itself in sufficient detail to meet the argument of appellant would be to reveal the precise secret information that was intended not to be revealed.

The officer had plain directions on what to seize, and was authorized to take only those articles containing "trade secret" information or data. Significantly, the warrant provided that the necessary access codes and passwords be provided so that a search of the computer storage could be examined for digitally stored "trade secret" programs as an alternative to the physical seizure of the "fixed disk drives" or "removable packs" of the computers on the premises covered by the warrant. Also, the warrant made provision for a representative of appellant's employer to be present during the copying of any information obtained through the use of such access codes or passwords. This warrant was limited to an identifiable class of material, viz., "trade secrets", in whatever form they might be found, all of which constitute seizable evidence of a criminal violation. The officer would seize anything else at his peril. Like the "whiskey" mentioned in *Steele v. United States No. 1*, 267 U.S. 498, 45 S.Ct. 414, 69 L.Ed. 757 (1925), from prohibition days, none of the items in the described class is innocent. We hold this warrant sufficiently particular in its description of the items to be seized and was correctly executed. Point of error four is overruled.

In his point of error five appellant expands on his previous complaint of a general exploratory search previously addressed and says that the seizures were not made pursuant to the authority granted under the search warrant. As we understand appellant's argument, he maintains that the warrant was directed to a peace officer commanding *him* to search but that he did not do so, but instead, allowed a representative of the complainant to select what he was to seize, and that the officer took items based on the discretion of this representative rather than the language of the warrant. Appellant relies on *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 94 L.Ed.2d 72 (1987) for the proposition that the officer is required to conduct a search pursuant to the mandates of the warrant so as to insure that the search will be carefully tailored to its justifications, and will not take on the character of an exploratory search. This is the often repeated language of *Marron v. United States*, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927), that warrants shall particularly describe the things to be seized and prevents the seizure of things not described and should leave nothing to the discretion of the officer. This standard originally derived from Colonial America and its aversion to writs of assistance and general warrants which placed broad discretionary authority with British custom officials to search anywhere for smuggled goods and seize anything they pleased.

 We are unable to perceive that appellant can draw support or comfort from this line of cases for his position that the officer acted improperly by the utilization of someone to aid him in the execution of this warrant. First, article 18.08, Texas Code of Criminal Procedure, specially authorizes the officer to do so. A literal reading of this article would suggest that any citizen called upon to aid an officer is bound to aid the officer and has little or no choice to do otherwise. Second, this article gives the option to call for aid to the officer and it is not necessary that the officer get his authority to request aid from the warrant and third, this warrant does not have the indices of a general warrant. It is limited to a search of a particular place and for particular items, viz., trade secrets.

The nature of these items, as heretofore mentioned, make it virtually impossible to set out a clear standard that the executing officer could use to differentiate a trade secret from a legitimate program; however, we hold the warrant with the affidavit attached provided substantially more than a generic description of the matters to be seized and gave the officer sufficient description that once the items were identified by someone knowledgeable and could recognize the trade secret, in whatever form it took, the officer could then determine whether it was seizable under the

warrant. On balance, considering the unique nature of the items being sought, use of assistance under article 18.08 by the officer would tend to limit or restrict the items seized rather than enlarge upon them. Point of error five is overruled.

## JURY MISCONDUCT

Finally, appellant asserts the court erred in overruling his motion for new trial. Appellant claims there was jury misconduct during deliberation in the initial guilt/innocent phase of the trial. In his original and supplemental motions for new trial, appellant presented affidavits of two jurors stating they had agreed to change their vote to guilty only after the other jurors agreed that appellant would be granted probation and not be sent to prison. During the hearing on the motion for new trial, three other jurors controverted this assertion in their testimony and insisted no such agreement was made among the jurors. The test for jury misconduct asks first whether there was misconduct, and second, did it result in harm. Reviewing courts have often concluded that charges of jury misconduct predicated upon jury consideration of punishment during deliberation on guilt/innocent are improper efforts to "impeach" the verdict by going into the thought processes of the jurors. Nevertheless, the basic principle remains that jurors should confine their deliberations to the evidence adduced at trial, lest a fair and impartial verdict according to law be improperly influenced by irrelevant and prejudicial matters not relating to either the guilt or innocence or punishment. Accordingly, the resolution of this point of error hinges upon whether appellant was improperly impeaching the jury's verdict or was, on the other hand, properly demonstrating jury misconduct.

Even when it is concluded that efforts to show juror discussion or consideration of punishment was impermissible impeachment of the jury verdict, the courts distinguish those cases in which the members of the jury *make an agreement* to render a guilty verdict in exchange for a lighter punishment. In *Daniels v. State*, 600 S.W. 2d 813, 816 (Tex.Crim.App.1980), the court observed that although leniency was discussed, "all four jurors stated there had been no agreements of any sort between them." *See Adams v. State*, 481 S.W.2d 884 (Tex.Crim.App.1972) (where three jurors announced they would vote with majority, "[a]bsent a showing that they agreed to be bound thereby, there is no error."). In contrast, appellant relies on *Vorwerk v. State*, 735 S.W.2d 672 (Tex. App.—Austin 1987, no pet.) and *Escarcega v. State*, 711 S.W.2d 400 (Tex.App.—El Paso 1986, pet. granted), with strikingly similar facts, and each court concluded the jury's conduct was in disobedience to the instruction to "restrict your deliberations solely to the issue of guilt or innocence of the defendant." Those courts held further that the jury had engaged in misconduct harmful to the defendant and since "the State failed to introduce any controverting evidence ... no issue of fact existed for the trial court to determine. In such case, a new trial should be granted."

The evidence adduced at this motion for new trial from two jurors was offered to establish that these two jurors voted to find the defendant guilty on the basis of an "understanding" that the defendant would not be sent to prison but would be granted probation. Appellant did not establish that any "agreement" had been made and the State put on controverting testimony from other jurors that no such understanding or agreement was reached to arrive at their verdict of guilty. This conflict in testimony raised an issue of fact as to misconduct for determination by the trial judge. Where the conflicting evidence raises such a fact issue, and the trial court overrules the motion for new trial, there is no abuse of discretion. *Sneed v. State*, 670 S.W.2d 262, 266 (Tex.Crim.App.1984); *McCartney v. State*, 542 S.W.2d 156, 162 (Tex.Crim. App.1976). We hold, therefore, that appellant has failed to carry his burden in showing he was denied a fair and impartial trial because of jury misconduct. Point of error six is overruled.

AFFIRMED.