**Affirmed as Modified and Opinion Filed November 30, 2021**



In The

## Court of Appeals
## Fifth District of Texas at Dallas

_____

### No. 05-19-01132-CR
_____

**TONNIEL MARQUIS BROWN, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1811801-U**

## MEMORANDUM OPINION

Before Justices Myers, Partida-Kipness, and Garcia
Opinion by Justice Partida-Kipness

Appellant Tonniel Marquis Brown appeals his murder conviction. In a single issue, he contends he is entitled to a new trial due to the erroneous admission of gunshot residue (GSR) evidence. Brown maintains that the GSR evidence was illegally seized and should have been suppressed because GSR was not particularly described in the search warrant and admission of the evidence was harmful. In one cross-point, the State seeks modification of the judgment to reflect the jury's finding of true to the enhancement paragraph. We conclude the trial court did not err by admitting the GSR evidence and agree the judgment should be modified as requested by the State. We affirm the judgment as modified.

# BACKGROUND

On the morning of January 23, 2018, Jose Ruiz was shot and killed while walking his dogs in the apartment complex where he lived. His wife, Wetsy Ramos, heard the gunshots followed by the sound of someone knocking on the front door. When Wetsy opened the door, she found her husband lying on the ground in a pool of blood. Other neighbors also heard the gunshots and called 911. Ruiz was conscious and talking when police and paramedics arrived. Ruiz was transported by ambulance to the hospital but did not survive.

No one witnessed the actual shooting. But Wetsy, other residents of the complex, and Ruiz's adult son, Anthony Ruiz, provided detectives with information that led to Brown becoming a suspect. That information included descriptions of the shooter and of vehicles exiting the complex after the shooting, testimony concerning Ruiz's statements to witnesses at the scene, and evidence that Ruiz and Brown argued at work the day before the shooting.

At the time of the shooting, Brown owned a dark gray, 2018 model Toyota Corolla sedan that matched the descriptions provided by two witnesses of a vehicle seen leaving the complex after the shooting. Todd Robins testified that the car was a "dark color" and looked "something like a sedan, I would say like a Toyota Corolla." When he initially spoke to detectives, however, he said he thought the car was a Toyota Camry. Anthony similarly reported that he saw a man drive away in a gray Toyota Camry after the shooting. Brown also generally matched witness

descriptions of the shooter; namely, that a "dark-skinned" man in "dark clothes" or a "dark-colored" or gray hoodie was seen running from the scene after gunshots rang out.

Moreover, witnesses confirmed that Ruiz and Brown argued at work the day before the shooting, and Ruiz was heard saying what sounded like Brown's first name, Tonniel, when asked who shot him. Wetsy told investigators that Ruiz had been involved in an argument with a coworker the day before the shooting. Other witnesses later confirmed that coworker was Brown. According to Wetsy, when Ruiz came home the night before the shooting, he seemed uneasy, but he did not want to talk about it. He just told Wetsy that he had "an argument with somebody at his job." Ruiz also woke up in the middle of the night like something was bothering him. Wetsy thought it was odd that Ruiz said anything at all to her about an argument at work because he was "very guarded about what's going on at his job" and would "never bring anything from work and that day he did." After finding Ruiz outside the apartment door, Wetsy asked him if the person he had argued with at work had "done this to him." Ruiz answered by nodding. Wetsy then ran inside and called 911. When officers arrived, she told them that Ruiz "had a fight at work with somebody . . . ." Wetsy told the jury that she had never heard the name Tonniel Brown before the shooting.

Other witnesses testified that Ruiz spoke to them before paramedics arrived and uttered words that sounded like "Tonniel." Anthony called 911 after finding his

father on the ground outside of the apartment. Ruiz can be heard in the background of that 911 call moaning and then saying something that sounded like Brown's first name, Tonniel. After Ruiz said the word twice, Anthony asked what sounded like "que," which means "what" in Spanish. Ruiz responded by repeating the word again. Anthony then asked "tornillo?" Ruiz again responded with the word, that time in a weaker tone. Anthony testified that he first thought that his father was saying "tornillo," which is Spanish for tourniquet, because Ruiz was bleeding through the leg. After Ruiz repeated the word, Anthony thought his father said "anillo," which means "ring" in Spanish. Anthony told detectives that he thought his dad was saying "my ring." At trial, Anthony testified that after listening to the 911 call again, he thinks Ruiz was saying "Fue Tonniel" which means "Tonniel did it." Anthony, like Wetsy, had never heard the name Tonniel before the shooting. Anthony testified that he believes that impacted why he was unable to understand what his dad was saying at the time.

Rebecca Valdez lived across the hall from Ruiz. After hearing gunshots and seeing Anthony outside, Valdez went outside to see what had happened. Ruiz spoke to her in Spanish and told her that he was shot three times by one person. Ruiz continued to speak with her, and Valdez thought he was saying "los ninos or lo nin ninos," which mean kids. Then she understood Ruiz to be saying "tonillo," which means nail, and she did not understand why he was telling her about a nail. The 911 operator who spoke to Valdez instructed her to ask Ruiz if he knew who shot him.

Ruiz is heard on the 911 recording saying "Tonniel," and Valdez told the operator that she did not know what that meant. Valdez testified that when she was interviewed by a detective later that day, she was told the suspect's name was Tonniel Brown. She told the jury that after hearing the name "Tonniel" she concluded that she was hearing Ruiz say "Tonniel" after the shooting, not "tonillo." Another resident of the complex, Kara Coker, testified that she opened her apartment door after hearing gunshots and could hear someone yelling "Oneal."

Detective Robert Huckaby was the lead investigator and case manager on the Ruiz case. He testified that the deciding factor to arrest Brown, in his opinion, was hearing Ruiz on the 911 tape "say what I consider to be telling us who did this." In addition to Ruiz's statements on the 911 tapes, Huckaby included additional factors in his probable cause affidavit for search warrant. Those included the argument between Brown and Ruiz the day before the shooting, Ruiz nodding "yes" when asked by Wetsy if the person he argued with at work shot him, and Brown's car matching the description given by two witnesses of a vehicle seen leaving the complex after the shooting.

Huckaby obtained a search warrant to search Brown's 2018 Toyota Corolla. When Detective Jeremy Chevallier executed the search warrant on Brown's vehicle, he noticed that it looked like half of the vehicle had been cleaned or washed because the driver's side looked cleaner than the rest of the car. Crime scene investigator, Stefani Campbell, conducted a GSR collection on the inside of the vehicle. She

–5–

completed GSR collection on the steering wheel, the shifter, the seat buckle, the inside door handle, and the car key.

Dr. Waleska Castro, trace evidence examiner at Southwestern Institute of Forensic Sciences (SWIFS), conducted GSR testing on the samples collected by Campbell. Dr. Castro's analysis confirmed four particles characteristic of primer GSR on the sample stubs collected from Brown's vehicle. Two particles were found on the sample stub from the steering wheel, one particle was found on the sample stub from the shifter, and one particle was found on the sample stub from the door. Dr. Castro also found one particle characteristic of primer GSR found on the car key. Primer GSR particles were not confirmed on the sample stub collected from the seat belt of Brown's vehicle or from Brown's hands.

The particles found consisted of antimony, barium, and lead. According to Dr. Castro, "[t]he presence of these particles on the surface could be due to discharging a firearm in the proximity of the surface or wiping a firearm or a firearm component or an object with primer gunshot residue against that surface." Dr. Castro described the particles found as "characteristic of gunshot residue" because "their chemistry is rarely found among particles from any other source than from the discharge of a firearm." No firearm was received into evidence for Dr. Castro to test and compare with the bullets and cartridges.

The Grand Jury of Dallas County indicted Brown on one count of first degree murder. *See* TEX. PENAL CODE § 19.02(c). The case first proceeded to trial in April

2019. That trial, however, ended in a mistrial due to a hung jury. The second trial took place in August 2019. The jury found Brown guilty of murder as charged in the indictment. Brown elected for the jury to assess punishment, and he plead true to the State's enhancement paragraph. The only witness to testify during punishment was Ruiz's wife, Wetsy. Following closing arguments, the jury reached a verdict on punishment. The jury found the State's punishment-enhancement allegation true beyond a reasonable doubt and assessed punishment at life imprisonment and a $10,000 fine. The trial court rendered judgment on August 30, 2019. The trial court denied Brown's pro forma motion for new trial and this appeal followed.

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019); *State v. Patel*, 629 S.W.3d 759, 764 (Tex. App.—Dallas 2021, no pet.). We give almost total deference to a trial court's rulings on questions of historical fact and mixed questions of law and fact that turn on an evaluation of credibility and demeanor, but we review de novo mixed questions of law and fact that do not turn on credibility and demeanor. *Lujan v. State*, 331 S.W.3d 768, 771 (Tex. Crim. App. 2011). We apply the de novo standard here because the trial court's ruling did not turn on the credibility of witness testimony. Further, where, as here, the trial court does not make express findings of fact, the reviewing court must view the evidence in the light most favorable to the trial court's ruling and should assume the trial court made implicit

–7–

findings of fact that support its ruling as long as those findings are supported by the record. *Id.*

## ANALYSIS

In his sole appellate issue, Brown argues that the trial court abused its discretion and committed harmful, constitutional error by overruling his motion to suppress the GSR evidence and admitting that evidence at trial. Brown contends that law enforcement officers violated his Fourth Amendment rights when they obtained samples from inside his vehicle and from his car key for GSR testing. Brown maintains that seizure of the samples was beyond the scope of the warrant.

The Affidavit for Search Warrant requests a warrant to search Brown's gray, 2018 Toyota Corolla and to search for and seize the following property if found during the search of the vehicle:

> CELLULAR PHONES, GLOBAL POSITIONING SATELLITE DEVICES, OR ANY ELECTRONIC DEVICE CAPABLE OF RECEIVING AND TRANSMITTING DATA, INCLUDING THE DATA CONTAINED THEREIN, (ANALYSIS OF THESE DEVICES MAY REQUIRE TRANSPORTING THE VEHICLE TO A SECONDARY LOCATION FOR CONNECTION TO DIAGNOSTIC TOOL), FIREARMS, FIREARM MAGAZINES OR OTHER AMMUNITION STORAGE DEVICES, FIREARM CASES OR OTHER ACCESSORIES, AMMUNITION EITHER LOOSE OR IN FACTORY PACKAGING, TRACE EVIDENCE IN THE FORM OF BLOOD SPATTER, HAIRS, FIBERS, DNA, OR OTHER BODILY FLUIDS, INCLUDING THE SURFACES ON WHICH SUCH EVIDENCE IS FOUND, PERSONAL PAPERS IN THE FORM OF RECEIPTS, NOTES, OR OTHER DOCUMENTS.

The subsequently-issued search warrant found probable cause for the search and permitted the search and seizure of the vehicle and the search and seizure of the property described in the affidavit.

Campbell conducted the GSR collection on the inside of the vehicle pursuant to the search warrant. She completed GSR collection on the steering wheel, the shifter, the seat buckle, the inside door handle, and the car key. And, as discussed above, lab analysis identified four particles characteristic of primer GSR on the sample stubs collected from Brown's vehicle. Brown moved to suppress that GSR evidence, arguing that GSR residue was not stated with particularity in the search warrant and, as such, was outside the scope of the warrant. The State argued that GSR evidence fell within the definition of ammunition and was, thus, included within the scope of the warrant. The trial court agreed with the State and denied the motion to suppress. Brown maintains that ruling constitutes harmful error. We disagree with Brown.

The Fourth Amendment requires warrants to "particularly" describe "the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. To comply with the Fourth Amendment, a search warrant must describe the things to be seized with sufficient particularity to avoid the possibility of a general search. *Groh v. Ramirez*, 540 U.S. 551, 558–61 (2004) (discussing various purposes for particularity requirement); *see also* U.S. CONST. amend. IV (providing that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

particularly describing the place to be searched, and the persons or things to be seized"); TEX. CODE CRIM. PROC. art. 18.01(c) (setting out requirements for affidavits supporting search warrants). The degree of specificity required is flexible and will vary according to the crime being investigated, the item being searched, and the types of items being sought. *Gonzales v. State*, 577 S.W.2d 226, 228–29 (Tex. Crim. App. 1979). To determine whether a search and seizure falls within the warrant's scope, we follow a common sense and practical approach rather than an overly technical one. *State v. Elrod*, 538 S.W.3d 551, 556 (Tex. Crim. App. 2017) (stating magistrate may use logic and common sense to make inferences based on facts in affidavit). A warrant that fails to describe "the items to be seized at all" is "plainly invalid." *Groh*, 540 U.S. at 557-58. A warrant's description of items to be seized is sufficiently particular, however, if the officer executing the warrant will reasonably know what items are to be seized. *Balderas v. State*, 629 S.W.3d 610, 614 (Tex. App.—Houston [1st Dist.] 2021, no pet.); *Harmel v. State*, 597 S.W.3d 943, 962-63 (Tex. App.—Austin 2020, no pet.). "The fourth amendment and the Texas Constitution and statutes do not require a minute and detailed description of the property to be seized, but the property must be so definitely described that the officer making the search will not seize the wrong property." *Schalk v. State*, 767 S.W.2d 441, 452 (Tex. App.—Dallas 1988), *aff'd*, 823 S.W.2d 633 (Tex. Crim. App. 1991).

Here, the warrant does not specifically list "gunshot residue" as an item to be seized. The warrant does, however, list "firearms, firearm magazines or other ammunition storage devices, firearm cases or other accessories" and "ammunition either loose or in factory packaging." As the State argued below, however, "ammunition" includes the propellant powder that makes up GSR. *E.g.*, 18 U.S.C. § 921(a)(17)(A) ("The term "ammunition" means ammunition or cartridge cases, primers, bullets, or propellent powder designed for use in any firearm."). Indeed, ammunition is commonly defined as "the projectiles with their fuses, propelling charges, or primers fired from guns." *E.g.*, *Ammunition, merriam-webster.com*, https://www.merriam-webster.com/dictionary/ammunition (last visited November 30, 2021). Moreover, during his interrogation of Brown, Detective Huckaby told Brown that he would obtain a search warrant to search Brown's vehicle for GSR evidence. Huckaby intended to collect GSR evidence as part of the search and seizure of Brown's vehicle. The failure to specifically list gunshot residue in the warrant, therefore, did not pose any threat that the wrong property would be seized. Based on a common-sense and realistic reading of the facts of the crime as set out in the search-warrant affidavit, in conjunction with the search warrant's authorization for the search and seizure of "ammunition either loose or in factory packaging," we conclude the trial court properly found that the search warrant authorized the seizure of GSR. *See, e.g.*, *Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020), *cert. denied*, *Gonzalez v. Tex.*, No. 21-5327, -- S.Ct. --, 2021 WL 5043646, at *1

–11–

(U.S. Nov. 1, 2021) (warrant specifying that the truck itself was to be seized and searched for firearms, ammunition, and other evidence that would connect appellant to the crime was "sufficiently particular to authorize a search of the truck's interior" and collect GSR evidence). The trial court did not abuse its discretion by overruling the motion to suppress and admitting the GSR evidence.

Further, even if the warrant had failed in its particularity, any error in admitting the GSR evidence would have been harmless. The record includes ample evidence from which a reasonable jury could determine that Brown was the shooter. Brown's vehicle matched witness descriptions of a vehicle seen leaving the apartment complex after gunshots rang out, and Brown argued with Ruiz the day before the shooting. Although a defense witness downplayed Brown's role in the argument and its intensity, the jury, as the sole judges of witness credibility, were permitted to disbelieve that testimony. *See Vernon v. State*, 571 S.W.3d 814, 819–20 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd) (jury is the sole judge of the credibility and weight of the evidence presented and may disbelieve some or all of a witness's testimony). Moreover, the jury heard the 911 recordings in which Ruiz can be heard saying what sounded like Brown's first name, Tonniel. Even Brown's counsel acknowledged that Ruiz could be heard on the 911 tapes saying "Tonniel," telling Detective Huckaby during cross-examination that you can "clearly hear him saying a name, Tonniel, correct" on the 911 call. Under this record, we conclude that

–12–

no substantial and injurious effect or influence resulted from the admission of this evidence. *See* TEX. R. APP. P. 44.2(b). We overrule Brown's sole appellate issue.

Brown also complains that GSR evidence was not included in the return and inventory. The failure to accurately complete an inventory is, at most, a ministerial violation of article 18.10 and generally does not require suppression of the evidence obtained through a valid search because such violations necessarily occur only after the evidence has already been obtained legally. *Woodberry v. State*, No. 05-18-00728-CR, 2019 WL 2863867, at *5–6 (Tex. App.—Dallas July 2, 2019, no pet.) (mem. op., not designated for publication) (citing *Martinez v. State*, 17 S.W.3d 677, 686 (Tex. Crim. App. 2000)). Unless Brown demonstrated prejudice due to unfair surprise, admitting the GSR evidence could not have constituted reversible error. *See Woodberry*, 2019 WL 2863867, at *5–6 (citing *Phenix v. State*, 488 S.W.2d 759, 766 (Tex. App. 1972)). Brown did not argue before the trial court that he would be prejudiced by unfair surprise. And Brown was not unfairly surprised by the State's introduction of the GSR evidence because the evidence was provided to Brown during discovery and Brown was aware of the evidence and the State's intention to admit the evidence when he moved to suppress the evidence before trial. The trial court did not abuse its discretion by denying Brown's motion to suppress evidence not listed in the return inventories. *See Woodberry*, 2019 WL 2863867, at *5–6; *see also Martinez*, 17 S.W.3d at 686; *State v. Manry*, 56 S.W.3d 806, 811 (Tex. App.—

Texarkana 2001, no pet.) (absent demonstration of prejudice, the evidence could not properly be suppressed based on failure to file a return and inventory).

For these reasons, we overrule Brown's sole appellate issue.

## STATE'S CROSS-POINT

In a single cross-point, the State requests modification of the judgment to correct a clerical error in the trial court's judgment. The State requests we modify the judgment to reflect the jury's finding of true to the enhancement paragraph. We have the power to modify a judgment to speak the truth when we have the necessary information to do so. TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd) (en banc). The record supports the requested modification and we, therefore, agree with the State that the judgment needs to be corrected.

The indictment included an enhancement paragraph alleging that Brown was previously convicted of the felony offense of domestic battery by strangulation. The record shows that Brown pleaded true to the enhancement paragraph, and that the jury found the enhancement paragraph true beyond a reasonable doubt. The judgment, however, incorrectly shows "N/A" for the plea and findings on the enhancement paragraph. The judgment should be modified to reflect Brown's plea of true and the jury's finding of true to the enhancement paragraph. Accordingly, we sustain the State's first cross-point and modify the trial court's judgment in the following manner: (1) in the space provided for "1st Enhancement Paragraph," we

delete "N/A" and replace it with "Pleaded True;" and (2) in the space provided for "Finding on 1st Enhancement Paragraph," we delete "N/A" and replace it with "True." *See Hawthorne v. State*, No. 05-19-01201-CR, 2021 WL 2451166, at *1 (Tex. App.—Dallas June 16, 2021, pet. ref'd) (mem. op., not designated for publication); *Gutierrez v. State*, No. 05-16-00755-CR, 2017 WL 2351346, at *1 (Tex. App.—Dallas May 31, 2017, pet. ref'd) (mem. op., not designated for publication).

## CONCLUSION

We overrule Brown's sole appellate issue and sustain the State's cross-point. Accordingly, we affirm the judgment as modified.

/Robbie Partida-Kipness/
ROBBIE PARTIDA-KIPNESS
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b).

191132F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

TONNIEL MARQUIS BROWN,
Appellant

No. 05-19-01132-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial
District Court, Dallas County, Texas
Trial Court Cause No. F-1811801-U.
Opinion delivered by Justice Partida-Kipness. Justices Myers and Garcia
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

(1) in the space provided for "1st Enhancement Paragraph," we delete "N/A" and replace it with "Pleaded True;" and (2) in the space provided for "Finding on 1st Enhancement Paragraph," we delete "N/A" and replace it with "True."

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 30th day of November 2021.