Thomas Barton **SCHALK** and Robert Gary **Leonard, Appellants,**

v.

The **STATE** of Texas.

Nos. 665–89, 666–89.

Court of Criminal Appeals of Texas, En Banc.

Oct. 2, 1991.

Rehearing Denied Dec. 4, 1991.

---

**634**

Gerald A. Banks, Michael P. Carnes, John H. Hagler, Dallas, for appellants.

John Vance, Dist. Atty., and Kathi Alyce Drew, Anne B. Wetherholt, Ted Steinke & Jane E. Jackson, Asst. Dist. Attys., Dallas,

Robert Huttash, State's Atty., Austin, for the State.

## APPELLANTS' PETITION FOR DISCRETIONARY REVIEW

MILLER, Judge.

Appellants were convicted of theft of trade secrets. V.T.C.A. Penal Code § 31.-05. They pled not guilty to the indictments [1] and were afforded a joint trial on the merits. A jury found both appellants guilty of the offenses as charged and assessed punishment at two years confinement in the Texas Department of Corrections [2] and a $5,000 fine for each. Appellants raised six points of error in the court of appeals, alleging the evidence was insufficient to establish trade secret status and mental culpability for the act of theft thereof, additional points concerning the authorization of the search, and an allegation of jury misconduct. The court of appeals affirmed appellants' convictions in separate published opinions. *Schalk v. State*, 767 S.W.2d 441 (Tex.App.—Dallas 1988); *Leonard v. State*, 767 S.W.2d 171 (Tex.App.—Dallas 1988). Appellants petitioned this Court on six grounds for review, two of which we granted, to-wit: 1) "The court of appeals erred in holding that the evidence is sufficient to show that the so-called computer programs that were alleged in the indictment were trade secrets"; and 2) "The court of appeals erred in holding that the search warrant sufficiently described the magnetic tapes that were seized and that the magnetic tapes were not seized pursuant to a general exploratory search." [3] We will affirm the court of appeals.

---

1. Schalk and Leonard were charged in separate indictments in cause nos. F–85–98689–M and F–85–9860–MHM, each charge for the offense of theft of trade secrets. Because of the close relationship between the two causes, appellants were tried jointly.

2. Now the Texas Department of Criminal Justice, Institutional Division.

3. The remaining grounds allege that the evidence was insufficient to prove that both appellants "knowingly" committed the offense, error resulting from jury misconduct, and unconstitutionality of Texas Penal Code § 31.05.

A brief recitation of the facts is necessary to set the background for the alleged commission of the instant offense. Appellants Schalk and Leonard are former employees of Texas Instruments (hereafter TI). Both men have doctoral degrees and specialized in the area of speech research at TI. Schalk resigned his position with TI in April 1983 to join a newly developed company, Voice Control Systems (hereafter VCS). In February 1985, Leonard resigned from TI and joined VCS. Several TI employees eventually joined the ranks of VCS. Speech research was the main thrust of the research and development performed by VCS. In fact, VCS was a competitor of TI in this field.

In April 1985 Sam Kuzbary, then employed with VCS and a former TI employee, noticed some information which he believed to be proprietary to TI stored in the memory of the computer he was using at VCS. Kuzbary contacted TI and agreed to serve as an "informant" for them. He then searched the premises of VCS and photographed materials which he recognized from his employment with TI. A TI internal investigation revealed that a few hours prior to Schalk's and Leonard's departures from TI, each appellant, utilizing TI computers, copied the entire contents of the directories respectively assigned to them. This information included computer programs which TI claimed to be its trade secrets.

Officials of TI then contacted the Dallas District Attorney's office. A search of the premises of VCS resulted in the seizure of computer tapes containing the alleged TI trade secret programs from appellants' offices. Appellants were arrested and the following indictments were returned:

THOMAS BARTON SCHALK, hereinafter styled Defendant, on or about the 27th day of April in the year of our Lord One Thousand Nine Hundred and Eighty–Three in the County and State aforesaid, did unlawfully, then and there, knowingly make a copy of an article representing trade secrets of Texas Instruments Incorporated, a corporation, to-wit: a computer disk on which the following computer programs were stored:

LPCSPEAK1.FOR created May 3, 1981 at 1:13 p.m.

LPCSPEAK2.FOR created January 10, 1982 at 5:04 p.m.

LPCSPEAK3.FOR created October 18, 1982 at 6:51 a.m.

LPCSPEAK4.FOR created October 27, 1982 at 1:56 p.m.

RTSSPEAK3.FOR created October 18, 1982 at 6:52 a.m.

and said Defendant copied said computer programs, which were the trade secrets of Texas Instruments Incorporated, from said computer disk onto a magnetic tape without the effective consent of Texas Instruments Incorporated, the owner of said trade secrets ...

ROBERT GARY LEONARD, hereinafter styled Defendant, on or about the 18th day of February in the year of our Lord One Thousand Nine Hundred and Eighty–Five in the County and State aforesaid, did unlawfully, then and there, knowingly make a copy of an article representing trade secrets of Texas Instruments Incorporated, a corporation, to-wit: a computer disk on which the following computer programs were stored:

V2REC 9.FOR created July 28, 1982 at 1:40 a.m.

V2REC 9LN.FOR created October 7, 1982 at 1:08 a.m.

V3REC 9.FOR created November 16, 1982 at 3:53 a.m.

V3REC 9.FOR created October 8, 1982 at 8:33 a.m.

V4REC 9.FOR created January 13, 1983 at 2:32 p.m.

and said Defendant copied said computer programs, which were the trade secrets of Texas Instruments Incorporated, from said computer disk onto a magnetic tape without the effective consent of Texas Instruments Incorporated, the owner of said trade secrets ...

To reiterate, we granted review to consider, first, whether the evidence was sufficient to establish that the computer programs named in the indictments were trade secrets, and second, to determine whether the items listed in the search warrant were

sufficiently described so as to preclude a general exploratory search. We will first address the trade secrets issue and then examine the search warrant to determine the specificity of its scope.

## Trade Secrets

We begin our discussion with the nature of the alleged trade secrets in the instant case, *viz* computer programs. Texas trade secret law has its origins in the civil law arena. See *BPI Systems, Inc. v. Leith*, 532 F.Supp. 208 (W.D.Tex.1981) (Fifth Circuit case applying Texas law utilizing the trade secrets definition from the Restatement of Torts, citing *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763 (1958)).[4] In *BPI*, the subject of the trade secret litigation was a computer software program, which the court found met the trade secrets definition under Texas civil law.

Prior to the enactment of § 31.05, theft of trade secrets was subject to criminal charges under theft of property statutes. See *Hancock v. State*, 402 S.W.2d 906, 908 (Tex.Cr.App.1966) (cites to theft statutes defining "property"). This Court's decision in *Hancock*, while not dispositive of the instant situation, does recognize computer programs as "property" subject to criminal jurisdiction.

Few cases have been decided under Penal Code § 31.05. See *Falcone v. State*, 682 S.W.2d 418 (Tex.App.—Houston [1st] 1984, no pet.) (in discussion of whether theft of trade secret computer programs was properly charged under the general theft statute, the court determined that the charge should have been made pursuant to the more specific theft of trade secrets statute). See also *Atkins v. State*, 667 S.W.2d 540 (Tex.App.—Dallas 1983, no pet.) (indictment for theft of trade secrets reading "architectural plans designed and drawn by Billy Joe Noles" held fatally de-

fective because it did not effectively identify the property in question).

Having determined that computer programs are proper subjects for trade secret litigation under Texas civil and criminal law, we now look to the case *sub judice* to determine whether the programs which appellants copied and took with them to VCS are trade secrets as defined by § 31.05 of the Penal Code, to-wit:

§ 31.05 Theft of Trade Secrets

(a) For purposes of this section:

(1) "Article" means any object, material, device, or substance or any copy thereof, including a writing, recording, drawing, sample, specimen, prototype, model, photograph, micro-organism, blueprint, or map.

(2) "Copy" means a facsimile, replica, photograph, or other reproduction of an article or a note, drawing, or sketch made of or from an article.

(3) "Representing" means describing, depicting, containing, constituting, reflecting, or recording.

(4) "Trade secret" means the whole or any part of any scientific or technical information, design, process, procedure, formula, or improvement that has value *and that the owner has taken measures to prevent from becoming available to persons other than those selected by the owner to have access for limited purposes.*

(b) A person commits an offense if, without the owner's effective consent, he knowingly:

(1) steals a trade secret;

(2) makes a copy of an article representing a trade secret; or

(3) communicates or transmits a trade secret.

(c) An offense under this section is a felony of the third degree. (emphasis supplied)

---

**4.** The definition in the Restatement of Torts, § 757, as approved in *Huffines*, 314 S.W.2d at 776 reads in pertinent part:

 b. Definition of trade secret. A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an oppor-

tunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. . . .

Appellants claimed on appeal that the programs did not meet the statutory trade secrets criteria because they alleged their former employer TI failed to take "measures to prevent [the information] from becoming available to persons other than those selected by the owner." V.T.C.A. Penal Code, § 31.05(a)(4). We note, as did the court of appeals, that the statute sets no standards for degree or sufficiency of the "measures" taken. See *Schalk,* 767 S.W.2d at 447; *Leonard,* 767 S.W.2d at 176.

Specifically, appellants pointed to considerable disclosure of speech research information, citing the "academic environment" of the laboratory in which they worked as encouraging the sharing of information, rather than maintaining secrecy. Appellants also claimed that TI policy favored protection of its research and development efforts through the patent process, as opposed to trade secret designation. Further, appellants allege that the programs that are the subject of the instant case were not listed in the TI register of trade secrets and that TI was lax in implementing its standard procedures with regard to notifying employees of trade secrets within the company. The precise issue before us in the case *sub judice* is one of first impression in Texas, to-wit: what constitutes requisite "measures" to protect trade secret status? Appellants emphasize the degree or extent to which "measures" were taken, rather than whether "measures" were taken. We agree with the court of appeals that the issue in this case presents a question of factual insufficiency. See *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could find the essential elements of the offense beyond a reasonable doubt). *Schalk,* 767 S.W.2d at 447; *Leonard,* 767 S.W.2d at 176.

We will analyze the court of appeals opinion in view of the "measures" · which that court found sufficient to meet the definition of trade secrets under section 31.05 of the Texas Penal Code. The court of appeals listing included the following measures:

*Non-disclosure Agreements*

1) non-disclosure agreements signed by all new employees when hired;

2) exit interviews with terminating employees to emphasize non-disclosure of confidential information;

*Plant Security*

3) identification badges to prevent unauthorized personnel from entering certain areas;

4) use of security guards and closed-circuit television monitors;

5) entry to speech lab limited to small number of total TI personnel; speech lab physically located in separate wing or building;

6) print-outs and hard copies of data were to be kept out of sight and nighttime security checks were conducted for data left out on desks; data found during such checks was subject to security report;

*Computer Software Security*

7) issuance of computer passwords or access codes so that data stored in restricted directories was not available to unauthorized personnel; all access required certain code clearance or password information before the computer would respond;

*Other Measures*

8) TI Trade Secret Register referred to "speech processing";

9) general reference to admonitions to lab personnel to protect software developed in the lab.

A literal reading of 31.05(a)(4) indicates that the above corporate actions and policies would qualify as "measures" under the statute, i.e., such that "the owner has taken measures to prevent from becoming available to persons other than those selected by the owner to have access for limited purposes." The statutory definition, without elaboration as to degree or type of measures, indicates that "some measures" would be sufficient, and we agree that the above listing does constitute "some measures" as the court of appeals determined. *Schalk,* 767 S.W.2d at 447;

*Leonard,* 767 S.W.2d at 176. We believe, however, that elaboration of the term "measures," beyond the scope of the court of appeals discussion, is necessary from the standpoint of the remainder of the definition, to-wit: "to prevent from becoming available to persons other than those selected by the owner to have access for limited purposes."

Appellants' claims on appeal to the court of appeals and to this Court focus on the encouraged disclosure of speech research information to non-TI personnel engaged in similar research activities. We therefore next direct our attention to the disclosure issue to determine whether appellants' first ground for review has merit. Appellants argue, somewhat convincingly, that TI encouraged the sharing of speech research to others in the same field, thereby demonstrating to the speech research community that TI was on the leading edge of such research and fostered the free flow of information on the subject. In support of their position, appellants point to numerous published articles and papers in which their research was discussed, meetings during which TI speech laboratory activities were shared, and the giving of certain information and materials to schools and government agencies involved in similar research projects.

Returning to the list of "measures" adopted by TI and scrutinizing them in light of the appellants' allegations of extensive disclosure, it becomes apparent that because we have limited precedent to guide us in this analysis, we must look to other jurisdictions for assistance. To facilitate the interpretation of these issues, we will group certain of the "measures" which have similar characteristics.

### Non–Disclosure Agreements

Appellants Schalk and Leonard each signed three separate types of non-disclosure agreements with TI. First, upon beginning employment with TI, each signed an "Employee Trade Secret Information Acknowledgement" agreement, which reads in pertinent part as follows:

> I, [Thomas Barton Schalk] [Robert Gary Leonard], upon my employment by Texas Instruments, Incorporated, have been advised:
>
> A. Of procedure SP 7–4–4, entitled "Safeguarding TI in Trade Secret Matters";
>
> \* \* \* \* \* \*
>
> E. That I am not to use for my own benefit or for the benefit of others, or disclose to other TIer's except on a "need to know" basis, with a statement that the information is TI proprietary or trade secret, or disclose to any person outside of TI, any TI proprietary or trade secret information or customer proprietary information received under appropriate written contract to which I have access.
>
> \* \* \* \* \* \* 5

Procedure SP 7–4–4 states TI policy for protecting trade secrets belonging to TI. Trade secret information is defined by TI, to-wit:

> Proprietary information owned by TI which is or may be used in TI business and which provides TI an advantage over competitors who do not know or use it. Trade secret information is sensitive information, important to TI, the unauthorized use or disclosure of which could seriously harm the business interests of TI. . . .

The definition further specifies that "software" is included in the types of technological information that may comprise a TI trade secret.

■ Second, appellants signed an "Assignment of Inventions and Company Information Agreement" form, which reads in pertinent part:

> In consideration of my employment by Texas Instruments Incorporated or any subsidiary thereof (hereinafter, collectively referred to as "TI"), I hereby agree as follows:

**5.** Paragraphs B., C., D., and F. refer to procedures for handling proprietary or trade secret information received from outside TI.

## I.

### ASSIGNMENT OF INVENTIONS

A. I agree to disclose promptly, completely and in writing to TI and I hereby assign and agree to assign and bind my heirs, executors, or administrators to assign to TI or its designee, its assigns, successors or legal representatives, any and all inventions, processes, diagrams, methods, apparatus, or any improvements (all hereinafter collectively called "inventions") whatsoever, discovered, conceived, and/or developed, either individually or jointly with others, during the course of my employment with TI (including any and all inventions based wholly or in part upon ideas conceived during my employment with TI), or using TI's time, data, facilities and/or materials, provided the subject matter is one within a field of interest of TI. My obligations under this paragraph apply without regard to whether an idea for an invention or a solution to a problem occurs to me on the job, at home, or elsewhere. I further agree that all such inventions are TI's exclusive property, whether or not patent applications are filed thereon.[6]

B. Subject matter within a field of interest of TI includes any field of interest that has been worked on by TI in the past, in which there is work in progress at the date of or during my employment with TI, and projects or other operations at TI planned for the future....

\* \* \* \* \* \*

## III.

### COMPANY INFORMATION

A. I recognize that my position with TI is one of highest trust and confidence by reason of my access to and contact with the trade secrets and confidential and proprietary business information of TI. I shall use my best efforts and exercise utmost diligence to protect and safeguard the trade secrets and confidential or proprietary information of TI.

B. Except as may be required by TI in connection with and during my employment with TI or with the express written permission of TI, I shall not, either during my employment with TI or thereafter, directly or indirectly, use for my own benefit or for the benefit of another, or disclose to another, any trade secret or confidential or proprietary information (whether or not acquired, learned, obtained or developed by myself alone or in conjunction with others) of TI, its customers, contractors or of others with which TI has a business relationship.

C. I further agree that all memoranda, notes, records, drawings, or other documents made or compiled by me or made available to me while employed by TI concerning any process, apparatus or products manufactured, used, developed, investigated or considered by TI or concerning any other TI activity shall be the property of TI and shall be delivered to TI upon termination of my employment or at any other time upon request.

\* \* \* \* \* \*

Last, each appellant participated in an exit interview conducted by the legal department prior to or at the time of termination of employment. An integral part of the exit interview is the signing of another non-disclosure form entitled "Trade Secret Listing for Termination of Employment." In this agreement, appellants acknowledged that they had been advised of their obligations to the company concerning trade secrets and proprietary information to which they had access during their employment with TI. The agreement further states, "I have been advised that I cannot disclose to others, or use for my own benefit or the benefit of others, any proprietary information and trade secrets to which I have had access at TI.... I am free to use

---

**6.** Appellants argue that TI relied on the patent process for protection of its speech research software, rather than trade secret status. We note, without further comment, that reliance on the "patent process" will not protect trade secrets prior to the issuance of the patent because the information remains a secret until the patent is issued. Upon issuance of a patent, the subject information becomes part of the public domain and is no longer protected by trade secret law. *Luccous v. Kinley Co.,* 376 S.W.2d 336 (Tex.1964).

information in the public domain and my own skill, knowledge, knowhow, and experience to whatever extent and in whatever way I wish so long as such use does not involve such trade secrets or proprietary information."

Employment contracts containing non-disclosure agreements are common in trade secret law. See *Aries Information Systems, Inc. v. Pacific Management Systems Corp.*, 366 N.W.2d 366 (Minn.App.1985) (in suit for misappropriation of trade secret, employees signed an "Employee Confidential Information Agreement" which the court considered as a reasonable effort to maintain the secrecy of computer software). In fact, courts have found the implied duty of confidentiality by virtue of the employer/employee relationship, even in the absence of a written agreement. See *Welex Jet Services, Inc. v. Owen*, 325 S.W.2d 856 (Tex.Civ.App.—Fort Worth 1959, writ ref'd, n.r.e.). Although a confidentiality agreement existed in *Welex*, the court stated that "[C]onfidential information secured by reason of fiduciary relationships may not be used or disclosed to appellant's detriment irrespective of an agreement not to do so." *Id.* at 858. Cf. *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, *cert. denied*, 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958) (fiduciary relationship of confidentiality existed between licensor/licensee in absence of written contract). Appellants unquestionably contracted with TI, giving rise to a fiduci-

ary duty not to disclose TI trade secrets or TI proprietary information to anyone not so designated by the company.

We now determine whether the information disclosed with TI's permission or encouragement, such as published articles, seminar papers, speeches given at public meetings, information provided to government agencies, etc., was so extensive as to destroy any trade secret status that may have existed regarding the computer software which is the subject of the instant indictments. It is axiomatic that the core element of a trade secret must be that it remain a secret. See generally 70 Tex.Jur.3d, § 36 and cases cited therein. However, absolute secrecy is not required. See *Q–CO Industries, Inc. v. Hoffman*, 625 F.Supp. 608 (S.D.N.Y.1985) (absolute secrecy not required, rather a substantial element of secrecy must exist). In the instant case appellants rely heavily on the facts detailing disclosure of the work performed in the speech research lab. Certainly, much information was disclosed to various sources through various means. The record reflects, however, from trial testimony by Dr. George Doddington, chief scientist and head of the speech research lab at TI, that the algorithms composing the actual software which is the subject of these indictments, were not disclosed, nor at any time was such disclosure encouraged or authorized. The relevant portion of Dr. Doddington's testimony follows:[7]

---

**7.** To facilitate an understanding of the technical terminology referenced in Dr. Doddington's testimony, we offer the following definitions obtained from Sippl, Computer Dictionary (4th ed.):

algorithm—a defined process or set of rules that leads and assures development of a desired output from a given input; a sequence of formulas and/or algebraic/logical steps to calculate or determine a given task; processing rules.

data base—a data base is a collection of data arranged in files used for more than one purpose.

program—a plan for the automatic solution of a problem. A complete program includes plans for the transcription of data, coding for the computer, and plans for the absorption of the result into the system. The list of coded instructions is called a routine. Program-

ming consists of planning and coding, including numerical analysis, specification of printing formats, and any other functions necessary to the integration of a computer into a system.

software—various programming aids that are frequently supplied by the manufacturers to facilitate the purchaser's efficient operation of the equipment. Such software items include various assemblers, generators, subroutine libraries, compilers, operating systems, and industry application programs.

system—an assembly of components united by some form of regulated interaction to form an organized whole; a devised and designed regular or special method, plan, methodology, or procedure. The organization of hardware, software, and people for cooperative operation to complete a set of tasks for desired purposes.

Q. Now, putting the directory listing aside for a moment, let me direct your attention specifically, well first, let me ask you, if, in your 16 years with Texas Instruments in the speech research area, has Texas Instruments ever given out any of it's [sic] speech recognition, speech synthesis, or, speaker verification, or voice verification software, to anybody?

A. Not to my knowledge.

Q. Have you ever personally given out, or authorized the giving out of any of the algorithms?

A. No, never.

Q. All right. And, you were the head of the speech research department?

A. I was the head of the speech research branch, yes.

Q. All right. Now regarding, State's Exhibit, 4-B, 4-C, 4-D, 4-E, and 4-F, the five computer programs that you have identified as coming from tape number four, you wrote them?

A. Yes, I wrote these.

Q. Have you, or Texas Instruments, ever given out those five computer programs to anyone, whether or not,—

A. No.

Q. With or without restrictions?

A. Correct.

Q. Have you ever given them out to anybody?

A. No.

Q. Okay. Let me show you, now, the computer programs that you have identified as coming off of tape number 16, State's Exhibit, 16-B, 16-C, 16-D, 16-E, 16-F, 16-G, 16-H, and 16-I, and I'll ask if you, or anybody else at Texas Instruments as [sic] ever provided these, or given these out to anybody outside of Texas Instruments for any reason, whatsoever?

A. No.

Q. State's Exhibit, 17-B, 17-C, 17-D, 17-E, 17-F, I'll ask you if you or anybody else at Texas Instruments has ever given out these five programs that came out of tape number 17?

A. Not to my knowledge.

Q. State's Exhibit, 18-B, 18-C, 18-D, 18-E, 18-F, and 18-G, these computer programs that came off of tape number 18, I'll ask you if you or anybody else at Texas Instruments has ever given those out to anybody without or with restrictions?

A. No, not to my knowledge.

Q. Or provided them to anybody?

A. No.

Q. Again, are those programs that fall within this third area, algorithms?

A. Yes.

Q. Now, you have given out, for limited purposes, some of the data bases?

A. Yes.

Q. And, for limited purposes, some of the tools?

A. Some, yes.

Q. But, not the algorithms?

A. Correct.

Q. Now, Doctor Doddington, you wrote all of the programs that we have just talked about in front of the Jury, correct?

A. Yes, some of them were subsequently modified—seventeen, was subsequently modified by Gary Leonard.

Q. But, you were the original author of all of them?

A. Yes.

Q. So, you are familiar with what they can do and what their value is?

A. Yes.

Q. How long would it take a competitor of Texas Instruments in the speech synthesis, and speech recognition areas to duplicate your efforts that were found on tapes 4, and 6, 16, 17, 18, and 19?

A. You mean how long would it take to develop these programs?

Q. How long would it take a competitor to develop those programs?

A. Well, to the best of my knowledge, these programs, or anything similar to them, did not exist anywhere except at Texas Instruments.

It's difficult for me an [sic] say how long it would take someone to do this, maybe never, years.

Q. How long—I'm sorry.

A. This is basically a culmination of fifteen years of speech research at Texas Instruments.

Q. Okay. Over that,—well, let's just say the last ten years of speech research at Texas Instruments, how much money has Texas Instruments invested in this speech research area, that you were working in?

MR. BANKS: Judge, that is repetitious. It's been asked and answered yesterday, I think we got a figure of one to two million dollars a year. It's repetitious.

THE COURT: Overruled.

THE WITNESS: At the rate of approximately one million dollars a year, or sometimes more, in the range of ten to twenty million dollars.

The exhibits referenced in Dr. Doddington's testimony correlate to the computer tapes and programs under indictment in the instant case.

In *Dickerman Associates, Inc. v. Tiverton Bottled Gas Co.*, 594 F.Supp. 30 (D.C.Mass.1984), the court held that although portions of the computer software system were disclosed during demonstrations to prospective purchasers, it represented but a small fraction of the whole system and this limited disclosure was insufficient to permit an understanding of the design and architecture of the program. Courts have also held that access to the computer software program by a few customers does not destroy trade secret status. *J & K Computer Systems, Inc. v. Parrish*, 642 P.2d 732 (Utah 1982). See also Annot., Computer Trade Secret, 53 A.L.R. 4th 1046, 1072, citing *Ward v. Superior Court*, 3 Computer L.Serv.Rep. 206 (Cal.Super.1972) (program held not generally available to public where owner did not sell details of program itself but only sold remote plotting service that the program made possible).

The instant situation is analogous to *Dickerman* and *J & K*. For example, in a letter transmitting computer software to the USAF Academy, Dr. Doddington stated the following:

Here is a tape containing the most significant software packages that we have in our laboratory that you desired to receive. I have enclosed both documentation and source listings for your use. I hope you find these data to be helpful in setting up your laboratory and structuring your software for maximum efficiency. Please understand that we can not [sic] support this software in any way other than to provide you with the listings as we are doing by sending you the tape.

With this in mind, and considering that the software is sensitive to the exact system configuration, the software that we are sending will probably find best use as a template or guide for helping you to define and develop your own software. . . .

This letter, ironically presented as defendant's exhibit, supports instead the State's position because it emphasizes the limited nature of the disclosure and is consistent with relevant caselaw on this topic. *Q–CO Industries*, 625 F.Supp. at 617, quoting *Imperial Chemical Indus. Ltd. v. National Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir.1965), to-wit: "... [A] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." We find, based on the record in this case, that the limited disclosures made by TI in regard to the speech research lab activities merely described the application and configuration of the certain elements of the software but did not reveal the actual composition of the programs.

Doddington testified that disclosure of the programs named in the instant indictments was never authorized. We note that even if TI had authorized disclosure of such programs on a limited basis, trade secret status would not necessarily be destroyed because it could still meet that part of the statutory definition which reads "that the owner has taken measures to prevent from becoming available to persons other than *those selected by the own-*

*er."* (emphasis added). V.T.C.A. Penal Code § 31.05(a)(4).

### Plant Security Measures

The measures used by TI to secure its premises to prevent unauthorized personnel from admission to or exposure to its proprietary research data were reasonable under the circumstances. The issuance of identification badges, use of security guards and closed-circuit television monitors, entry to the speech lab limited to small number of personnel, nighttime security checks, etc. are fairly common to research oriented industries. Although these measures relate to the TI plant and not specifically or uniquely to the speech lab, they do affect and serve to limit access to the speech lab, and therefore serve to protect the trade secret status of the information developed therein.

### Computer Software Access

Testimony at trial enumerated detailed restricted user access basically utilizing a series of passwords and restrictive codes in order to access the desired software utilities. Trade secret caselaw dealing with computer software recognizes these types of measures as protective of trade secret status. See generally, Annot., 53 A.L.R. 1046, § 7[a] (cases supporting trade secret status for computer software).

### Other Measures

The court of appeals listed as one of the preventive measures the fact that the TI Trade Secret Register referred to "speech processing." Conflicting testimony indicates that the register entry may relate to a different area of speech research than that conducted in the lab by appellants and therefore did not refer to the software programs under indictment. We find the evidence inconclusive to support the theory that the register entry refers to the specific software involved in the instant case. It was also brought out in testimony that the Trade Secret Register was not timely updated and distributed to TI employees in accordance with the company policy manual. Further, the "admonitions" to lab personnel to protect lab software are simply too general in nature to determine whether they should be considered a protective measure. In fact, such "admonitions" were tempered with memoranda and conversations that encouraged sharing of information with others outside TI.

Correlative to the above-mentioned Trade Secret Register and "admonitions" regarding non-disclosure, appellants also claimed that they were not informed by TI that the programs which they worked on at TI and later took with them to VCS were trade secrets. In support of this contention, they point out that the TI Trade Secret Register was not updated and distributed to employees in a timely manner as was required by the company policy manual. They further contend that the "speech processing" entry in the Register is not the speech research with which they were involved. In addition, they claim that extensive dissemination of certain information destroyed any secrecy that may have existed or been intended. Clearly, the contractual agreements that appellants made with TI gave appellants ample notice that their employment would be directed towards proprietary and trade secret information. Indeed the actual programs they developed were not in existence at the time they signed the initial agreements, so they could not have been named definitively. Granted, a stronger case for the State would have resulted from the naming of the subject programs in the exit interview agreements. Even so, if the programs were trade secrets at time of creation, there is insufficient evidence to suggest that trade secret status was destroyed prior to the exit interview. Because the exit interview agreement covers trade secrets, and the exit form itself states that it is non-exclusive, listing of the specific programs was not a requirement to maintain trade secret status.

### Conclusion

■ We need not decide today whether any one of the preventive measures listed, standing alone, is factually sufficient to support trade secret status. We do find

that the combination of employment agreements, strict plant security, restricted computer access, the non-authorization of disclosure of the subject programs and the general non-disclosure of those programs by TI and its employees served to support trade secret status of the computer programs that are the subject of the instant indictments. Appellants neither requested nor received permission to copy the files containing these programs. The unauthorized copying of an article representing a trade secret constitutes an offense under V.T.C.A. Penal Code § 31.05(b)(2). Therefore we affirm the court of appeals' ruling that the subject programs are trade secrets. Appellants' first ground for review is overruled.

### Search Issue

■ In their second ground for review, appellants contend the court of appeals erred in holding the search warrant sufficiently described the magnetic tapes that were seized and that the tapes were not seized pursuant to a general exploratory search.[8] We have reviewed the court of appeals' opinions and, as they pertain to the facts of this case, we adopt its treatment of the appellants fourth point of error. See *Leonard*, 767 S.W.2d at 181–82, and *Schalk*, 767 S.W.2d at 452–53. The court of appeals framed this issue under Art. I, § 9 of the Texas Constitution, although also citing federal precedent. In our recent decision in *Heitman v. State*, 815 S.W.2d 681 (Tex.Cr.App.1991), we expressly concluded that this Court, when analyzing and interpreting Art. I, § 9 of our constitution, would not be bound by decisions of the United States Supreme Court addressing the comparable Fourth Amendment issue. *Id.* The question of whether our state constitution should provide more protection than the federal constitution in this case was not presented in the appellants' second ground for review, and we therefore express no opinion on that issue. See *Id.*, at 690–91, fn. 23 (Court requires separate ground and substantive analysis on state and federal constitutional claim). With this caveat, however, we approve of the court of appeals' opinion on appellants' fourth point of error, and, thus, we overrule appellants' second ground for review. *January v. State*, 732 S.W.2d 632 (Tex.Cr.App.1987).

Accordingly, the judgment of the court of appeals is affirmed.

McCORMICK, PJ., concurs in the result.

CLINTON, J., dissents to disposition of the second ground for review.

---

**8.** We have attached to this opinion copies of the search warrant, related orders, and protective orders as Appendix 1.

## APPENDIX I.
### AFFIDAVIT FOR SEARCH WARRANT

THE STATE OF TEXAS §
§
COUNTY OF DALLAS §

THE UNDERSIGNED AFFIANT, BEING A PEACE OFFICER UNDER THE LAWS OF TEXAS AND BEING DULY SWORN, ON OATH MAKES THE FOLLOWING STATEMENTS AND ACCUSATIONS:

1. THERE IS IN DALLAS COUNTY, TEXAS, A SUSPECTED PLACE AND PREMISES DESCRIBED AND LOCATED AS FOLLOWS: The business offices of Voice Control Systems, Inc., (hereinafter referred to as VCS), located on the second floor of a two (2) story tan stone structure with brown wood trim and brown tile roof, said structure being the southernmost building of a three (3) building complex, located at 16610 Dallas Parkway, Dallas, Dallas County, Texas said offices having entrance doors identified as Doors A, B, C, and D on the diagram attached hereto and incorporated by reference herein as Exhibit I, with Door B having on it the words "Voice Control Systems."

2. THERE IS AT SAID SUSPECTED PLACE AND PREMISES PERSONAL PROPERTY CONCEALED AND KEPT IN VIOLATION OF THE LAWS OF TEXAS AND DESCRIBED AS FOLLOWS: Property constituting evidence of an offense, to-wit: Theft of Trade Secrets in violation of Section 31.05, Texas Penal Code, said property being Texas Instruments Incorporated (hereinafter referred to as TI) computer software, proprietary information and data relating to research in the field of speech recognition, more fully described as follows:

 a) Digital storage media containing, in whole or in part, information and/or data and/or files belonging to TI, to-wit: magnetic tapes containing active data, and the corresponding archive tapes and backup tapes; removable disks containing active data, and the corresponding archive tapes and/or disks and backup tapes and/or disks; and fixed disks containing active data, and the corresponding archive tapes and/or disks and backup tapes and/or disks; and

 b) Documents and other written materials containing, in whole or in part, "trade secret" information and/or data and/or files belonging to TI, to-wit: notebooks, pamphlets, instructions, summaries, manuals, correspondence, memorandums, papers, file listings, file directories,and file dumps.

3. SAID SUSPECTED PLACE AND PREMISES ARE IN CHARGE OF AND CONTROLLED BY EACH OF THE FOLLOWING PERSONS: Dr. Ramon Eugene Helms, W/M/01-27-51, Thomas Barton Schalk, W/M/06-10-51, Robert Gary Leonard, W/M/09-27-43, Peter Foster, Neal Robinson, and others.

4. IT IS THE BELIEF OF THE AFFIANT AND HE HEREBY CHARGES AND ACCUSES THAT: Robert Gary Leonard, Thomas Barton Schalk and others, in Dallas County, Texas, between the dates of April 1, 1983 and May 10, 1985, did unlawfully, without the effective consent of TI, knowingly steal trade secrets belonging to TI, did knowingly make copies of articles representing trade secrets belonging to TI, and did knowingly communicate and transmit trade secrets belonging to TI to employees and representatives of VCS, contrary to Section 31.05, Texas Penal Code, and against the peace and dignity of the State of Texas.

5. AFFIANT HAS PROBABLE CAUSE FOR SAID BELIEF BY REASON OF THE FOLLOWING FACTS:

1) My name is John W. Palich, and I am a peace officer of the State of Texas, employed as a Special Investigator with the Specialized Crime Division of the Dallas County Criminal District Attorney's Office. I have been so employed since November, 1975.

2) On Thursday, May 9, 1985, at approximately 2:00 pm, I had a personal meeting and conversation with Myron I. Weinstein, former Deputy Director of the United States Secret Service and currently Vice President, Corporate Staff, Safety and Security for TI, and Gary D. McGrew, Regional Security Manager, Corporate Security for TI. McGrew informed me that a confidential informant, (hereinafter referred to as the CI), a current employee of VCS, had within the past two (2) weeks advised him as follows:

a) that certain officers and employees of VCS have possession of TI computer software, proprietary information and data relating to research in the field of speech recognition;

b) that the CI had personally seen in the VCS office of Robert Gary Leonard, an ex-TI employee, at least five (5) magnetic tapes and a bound manual entitled "Time Shared Optical Character Recognition System" marked "TI Classified, Strictly Private, Property of Texas Instruments ONLY," which the CI believed were the property of TI;

c) that the CI had seen at VCS in cardboard boxes known by the CI to belong to Thomas Barton Schalk, an ex-TI employee, various documents which the CI believed were the property of TI, including a document entitled "Speech Recognition Task Force, Final Report, July 1981" marked "TI Strictly Private;" and

d) that several officers and employees of VCS, including Leonard and Schalk, made periodic reference to the "TI stolen data base" and the "TI stolen files."

McGrew informed me that the CI had, on the CI's own initiative, removed from VCS the two (2) above described documents and had given them to him on or about April 30, 1985, and that said documents had been identified by TI personnel as belonging to TI. McGrew informed me that the CI had also removed from VCS, on the CI's own initiative, a number of other documents which were turned over to McGrew on or about April 29 and April 30, 1985, and which have been identified by TI personnel as belonging to TI. McGrew also informed me that the CI had, again on the CI's own initiative, made copies of various computer directories and computer files from the computer at VCS, and had turned them over to McGrew on or about April 30, 1985, May 1, 1985 and May 6, 1985, and that said copies had been identified by TI personnel as containing proprietary information and data belonging to TI. McGrew further informed me that the CI was willing to talk to me.
 At this same meeting, Weinstein informed me that Robert Gary Leonard was employed at TI on or about December 6, 1971, and resigned from TI on or about February 28, 1985; that at the time of his resignation, Leonard's duties included research in the field of speech recognition, under the supervisor of George R. Doddington, Branch Manager for the Speech Research Branch of TI's Computer Science Laboratory; that Leonard left TI to join VCS; and that at Leonard's "exit interview," on or about February 28, 1985, Leonard signed a document entitled "Trade Secret Listing for Termination of Employment," in which he acknowledged being advised concerning disclosing to others or using, for his own benefit or the benefit of others, any proprietary information or trade secrets of TI. Weinstein further informed me that Thomas Barton Schalk was employed at TI on or about September 4, 1979, and resigned from TI on or about April 28, 1983; that at the time of his resignation, Schalk's duties included research in the field of speech recognition, under the supervision of George R. Doddington; that Schalk left TI to join VCS; and that at Schalk's "exit interview," on or about April 28, 1983, he too signed a "Trade Secret Listing for Termination of Employment."

3) On Monday, May 13, 1985, at approximately 5:30 pm, I had a personal meeting and conversation with the CI, who is a current employee of VCS, and the CI told me the following:

a) that certain officers and employees of VCS, including Leonard and Schalk, have possession of TI computer software, proprietary information and data relating to research in the field of speech recognition, that said officers and employees, including Leonard and Schalk, have made recent references to the "TI files" in the CI's presence, and that Leonard is currently engaged in converting TI software to VCS software;

b) that on or about April 27 or April 28, 1985, the CI observed and photographed in Leonard's office at VCS five (5) magnetic tapes, each bearing the brand name "Quadronix 1," and being respectively labeled "SPDIR.BCK", "SPRGL.BCK", "SPGD.BCK", "DRAFT.BCK", and "Label: ADDR Copy used", which tapes the CI believed to be the property of TI, and that the CI also observed and photographed at the same time and place a sixth (6th) magnetic tape, which the CI believed to be a "data base" tape belonging to TI, and several manuals which the CI believed to be the property of TI (at this meeting, the CI produced prints of said photographs, which I now have possession of, and I observed in said photographs the above mentioned tapes and manuals, with one of the manuals in fact bearing the "TI" logo), and further, that the CI personally observed said tapes and manuals in Leonard's office at VCS at approximately 3:30 pm on Monday, May 13, 1985;

c) that on or about April 25, 1985, the CI made a hard-copy of three (3) computer files stored in the VAX-750 computer at VCS, which the CI believes to be TI proprietary information and data, and which the CI turned over to McGrew on or about April 30, 1985, the second of said files containing a computer program on which appears the language "Modified 4-19-85 by Gary Leonard to handle both VCS files and TI files" (I personally observed and now have custody of this hard-copy, and I observed in it the above referenced notation);

d) that on or about May 1, 1985, the CI made hard-copies of two (2) additional computer files from the VCS computer, which the CI turned over to McGrew on or about the same day, one (1) of which contains the "directory" (table of contents) of all programs carried on the VCS computer under Leonard's name which were created prior to February 1, 1985, and the other containing the "directory" of all programs carried on the VCS computer under Schalk's name which were created prior to June 1, 1983 (I personally observed and now have custody of said hard-copies);

e) that on or about May 3, 1985, the CI made a hard-copy of another computer file from the VCS computer, which the CI turned over to McGrew on or about May 6, 1985, and which purports to contain the "weekly internal reports" of Schalk regarding speech recognition research beginning in November, 1981 (I personally observed and now have custody of said hard-copy);

f) that on or about April 27 or 28, 1985, the CI observed the bound manual entitled "Time Shared Optical Character Recognition System" (referred to in Section 5, Paragraph 2b of this Affidavit) in Leonard's office at VCS, and the CI took said manual and turned it over to McGrew on or about April 30, 1985 (I personally observed and now have custody of said manual); the CI further told me that the CI took several additional documents believed to be the property of TI from Leonard's office at the same time, and turned those over to McGrew on or about April 30, 1985 (which I also personally observed and now

have custody of );

g) that during the last two (2) weeks of April, 1985, the CI observed the "Speech Recognition Task Force, Final Report, July 1981" (referred to in Section 5, Paragraph 2c of this Affidavit) in cardboard boxes at VCS which the CI knew to belong to Schalk, and that the CI took said Report and turned it over to McGrew on or about April 30, 1985 (I personally observed and now have custody of said report); the CI further told me that the CI observed additional documents marked "TI Strictly Private" in these cardboard boxes, and that the CI took some of those as well and gave them to McGrew on or about April 30, 1985 (I personally observed and now have custody of these documents as well); and

h) that VCS currently has two (2) VAX-750 computers on premises, one of which is currently on-line, and one of which is in the process of going on-line, and in which are stored, on fixed disks and/or removable disks, what the CI believes to be software, proprietary information and data belonging to TI.

4) On Monday, May 13, 1985, at approximately 2:00 pm, I had a personal meeting and conversation with George R. Doddington, Branch Manager for the Speech Research Branch of TI's Computer Science Laboratory, who told me the following:

a) that he has been the Branch Manager for the Speech Research Branch at TI since 1976, and as such is intimately familiar with the research done by personnel working within the Branch, which research includes speech technology, speech generation and speech recognition; further, that such research, and the documents, computer software, information and data generated therefrom, are considered the proprietary property of TI and as such are confidential trade secrets; and further, that the possession by VCS officers and employees of TI proprietary speech research information and software is harmful to TI, since over $5,000,000.00 has been invested in TI's research over the last five years, and since possession of such information and software could give a direct competitor of TI, like VCS, a substantial competitive position in the field of speech technology without the usual expenditure of time and resources such as TI had made;

b) that he had been Leonard's supervisor from 1976 until on or about February 28, 1985, the date Leonard left TI to go to work for VCS; and further, that Leonard's duties included research in the field of speech recognition, and that Leonard was familiar with TI's software; and further, that during the course of Leonard's work, he appraised him of the proprietary nature of the speech software;

c) that he had been Schalk's supervisor from 1979 until on or about April 28, 1983, the date Schalk left TI to go to work for VCS; and further, that Schalk's duties included research in the field of speech recognition, and that Schalk was familiar with TI's software; and further, that he also appraised Schalk during his tenure of the proprietary nature of the speech software;

d) that he has personally examined the two (2) hard-copies made by the CI (referred to in Section 5, paragraph 3d of this Affidavit), and finds them to contain "directory listings" which are extremely similar to, and in many cases, identical with TI directory listings; and further, that the creation dates on the vast majority of software (programs) on these two (2) VCS directories correspond exactly to the creation dates of the corresponding TI proprietary software, many of which predate 1983, when Schalk left TI to join VCS, and most of which predate February 28, 1985, when Leonard left TI

to join VCS;

e) that he has personally examined the hard-copy made by the CI of Schalk's weekly internal reports (referred to in Section 5, paragraph 3e of this Affidavit), and finds it to contain verbatim his (Doddington's) own weekly internal reports beginning in November, 1981, which again predates Schalk's arrival at VCS; and

f) that he has personally examined the "Speech Recognition Task Force, Final Report, July, 1981," which the CI obtained from cardboard boxes at VCS belonging to Schalk (referred to in Section 5, paragraph 3g of this Affidavit), and finds that this is a legitimate TI proprietary document in that it is a strategic speech recognition technology forecast, and as such contains extremely sensitive information regarding future planning by TI, which has validity for many years.

5) At the same meeting with Doddington, on May 9, 1985, I had a personal conversation with Henry P. Griggs, Branch Manger of the Central Research Laboratory Computer Facility at TI, which provides all of the computer processing facilities and related support for TI's Computer Science Laboratory. He informed me that TI has used in the past and continues to use magnetic tapes bearing the brand name "Quadronix 1", and after examining the photos of the magnetic tapes found in Leonard's office at VCS (referred to in Section 5, paragraph 3b of this Affidavit), he advised me that the tapes in the photos appear to be of the type TI uses. He further informed me that he is familiar with the VAX-750 computers which the CI says are at the VCS offices, and in which TI software, proprietary information and data is stored, inasmuch as TI also uses a VAX-750 computer, and that in order to search for and retrieve such software, proprietary information and data, it will be necessary to gain access to the computers thru the use of access codes and passwords which should be known to the officers and employees of VCS. He further informed me that without said access codes, it will be necessary to remove from said computers the "fixed disk drives" and/or the "removable packs," in which said software, proprietary information and data is stored on either fixed or removable disks. Thus, affiant requests that the search warrant require the officers and employees of VCS to provide, to the peace officers serving said warrant, all access codes and passwords necessary to search for and retrieve said software, proprietary information and data, and to remove and seize the computer "fixed disk drives" and/or "removable packs" if said officers and employees of VCS refuse to furnish said access codes and passwords.

6. Affiant believes that the CI is credible and that the CI's information is reliable for the following reasons: the CI has never before been convicted of a misdemeanor or felony offense in Texas or in any other state, nor is the CI wanted by any local, state or federal law enforcement agencies; Affiant has had personal conversations with the former employers of the CI who informed Affiant that the CI's reputation for truth and veracity is excellent; Affiant has verified, through independent means, the CI's background in speech recognition research; and the computer hard-copies and the documents described above in this affidavit, given to TI by the CI, have been verified by TI representatives as being authentic. Thus, Affiant believes, based upon the information from Weinstein, McGrew, Doddington and Griggs, and based upon the statements of the CI, which are corroborated by the physical evidence described above in this affidavit, that the items of property described in Section 2 of this affidavit are located in the offices of VCS, and further that said items of property constitute evidence tending to show the commission of the offense of Theft of Trade Secrets.

WHEREFORE, AFFIANT ASKS FOR ISSUANCE OF A WARRANT THAT WILL
AUTHORIZE HIM TO SEARCH SAID SUSPECTED PLACE AND PREMISES FOR
SAID PERSONAL PROPERTY AND SEIZE THE SAME.

_____
AFFIANT

SUBSCRIBED AND SWORN TO BEFORE ME SAID AFFIANT ON THE
____ DAY OF _____ , 19___.

JUDGE OF THE 203
District Court
DALLAS COUNTY, TEXAS

(original)

## EXHIBIT A

### SEARCH WARRANT

THE STATE OF TEXAS §
§
COUNTY OF DALLAS §

THE STATE OF TEXAS: to the Sheriff or any Peace Officer of Dallas County, Texas, or any Peace Officer of the State of Texas.

GREETINGS:

WHEREAS, the Affiant whose signature is affixed to the Affidavit attached hereto is a Peace Officer under the laws of the State of Texas and did heretofore this day subscribe and swear to said Affidavit before me (which said Affidavit is by this reference incorporated herein for all purposes) and whereas I find that the verified facts stated by Affiant in said Affidavit show that Affiant has probable cause for the belief he expresses therein and establishes the existence of proper grounds for the issuance of this Warrant:

NOW, THEREFORE, you are commanded to enter the suspected place and premises described in said Affidavit, namely, the offices of Voice Control Systems, Inc. (hereinafter referred to as VCS), located at 16610 Dallas Parkway, Dallas, Dallas County, Texas, and to there search for the personal property described in said Affidavit and to seize the same and bring it before me, to-wit:

a) All digital storage media which contains or is reasonably believed to contain, in whole or in part, information and/or data and/or files belonging to Texas Instruments Incorporated (hereinafter referred to as TI), to-wit: magnetic tapes containing active data, and the corresponding archive tapes and backup tapes; removable disks containing active data, and the corresponding archive tapes and/or disks and backup tapes and/or disks; and fixed disks containing active data, and the corresponding archive tapes and/or disks and backup tapes and/or disks; and specifically including five (5) magnetic tapes bearing the brand name "Quadronix 1", and respectively being labeled "SPDIR.BCK", SPRGL.BCK", SPGD.BCK", "DRAFT.BCK", and "Label: ADDR Copy used"; and

b) All documents and other written materials containing, in whole or in part, "trade secret" information and/or data and/or files belonging to TI and which are possessed in violation of the law, to-wit: notebooks, pamphlets, instructions, summaries, manuals, correspondence, memorandums, papers, file listings, file directories, and file dumps, including all such documents marked "TI Strictly Private" or "TI Classified;" and

c) All access codes and passwords necessary to search the VAX-750 computers at VCS and to retrieve said software, proprietary information and data, as described in paragraph a) above, from said computers, so that said material may be transferred onto blank magnetic tapes; or, in the alternative, all "fixed disk drives" and/or "removable packs" of said computers.

## EXHIBIT A—Continued

IT IS FURTHER ORDERED that the officers conducting this search allow a representative of VCS to be present during said search and seizure, and during the copying of any computer disks as provided in the Order attached hereto, and that a signed inventory be given to said representative of VCS for the items seized.

Herein fail not, but have you then and there this Warrant within three days, exclusive of the day of its issuance and exclusive of the day of its execution with your return thereon, showing how you have executed the same.

ISSUED AT _____ *11:25* _____ o'clock _*P*_ M., on this the _*15*_ day of _____ *May* _____, 19 *85* to certify which witness my hand this day.

JUDGE OF THE 203
District Court
DALLAS COUNTY, TEXAS

## RETURN AND INVENTORY

THE STATE OF TEXAS §
 §
COUNTY OF DALLAS §

The undersigned Affiant, being a Peace Officer under the laws of Texas and being duly sworn, on oath certifies that the foregoing Warrant came to hand on the day it was issued and that it was executed on the _____ day of _____, 19 _____, by making the search directed therein and seizing during such search the following described personal property:

AFFIANT

SUBSCRIBED AND SWORN to before me, the undersigned authority, on this the _____ day of _____, 19 _____.

Notary Public in and for
Dallas County, Texas

EXHIBIT B

| IN RE: THE STATE OF TEXAS | § | IN THE 203RD |
|---|---|---|
| VS. | § | JUDICIAL DISTRICT COURT |
| VOICE CONTROL SYSTEMS, INC. | § | DALLAS COUNTY, TEXAS |

### ORDER ALLOWING COPYING AND
### STORAGE OF PROPERTY

WHEREAS, on May 15, 1985, contemporaneous with this Order, this Court issued a Search Warrant for the offices of Voice Control Systems, Inc. (hereinafter referred to as VCS) located at 16610 Dallas Parkway, Dallas, Dallas County, Texas upon the sworn Affidavit of John W. Palich, Special Investigator with the Specialized Crime Division of the Dallas County Criminal District Attorney's Office, and

WHEREAS said Search Warrant authorized the search for and seizure of, among other items, computer software, proprietary information and data stored in two (2) VAX-750 computers at the offices of VCS, it is therefore

ORDERED that all such software, proprietary information and data stored in said computers on fixed disks be copied onto blank magnetic tapes by representatives of Texas Instruments Incorporated under the direction and supervision of John W. Palich, said copying to be done forthwith at the offices of VCS in the presence of a representative of VCS, in accordance with said search warrant, and that said magnetic tapes, along with all other items seized pursuant to said search warrant, be kept in a safe and secure manner at the offices of the Specialized Crime Division, 2720 Stemmons Freeway, 400 Tower South, Dallas, Texas 75207, under the care, custody and control of John W. Palich, and it is further

ORDERED that no disclosure be made of any such items seized except for the limited purpose of determining if said items contain, in whole or in part, information and/or data and/or files belonging to TI, and which are possessed in violation of the law, and it is further

ORDERED that any items not identified as containing information and/or data and/or files belonging to TI be forthwith returned to VCS, and it is further

ORDERED that no public disclosure be made of the contents of any items seized pursuant to said search warrant without a further Order of this Court.

DATED this the _____*15*_____ day of ___*May*___, 1985.

*[signature]*

~~JUDGE PRESIDING~~
*203 District Court*
*Dallas County Texas*

EXHIBIT C

IN RE: SEARCH WARRANT OF § IN THE 203rd JUDICIAL
 MAY 15, 1985 § DISTRICT COURT
 (VOICE CONTROL SYSTEMS, § DALLAS COUNTY, TEXAS
 INC.) §

## ORDER

Whereas, pursuant to an Affidavit filed with this Court on May 15, 1985, a Search Warrant was issued directing the search of the premises of Voice Control Systems, Inc., 16610 Dallas Parkway, Dallas, Dallas County, Texas; and

Whereas, pursuant to said Search Warrant, a search was conducted on said premises and certain items of evidence were seized, as evidenced by an Inventory signed and filed with this Court on May 20, 1985; and

Whereas, certain parts of the evidence seized may contain computer programs and/or data of a secret and/or proprietory nature relating to Voice Recognition Technology (hereinafter referred to as "Confidential Information") of either Voice Control Systems, Inc. (hereinafter referred to as VCS) or Texas Instruments, Inc. (hereinafter referred to as TI); and

Whereas, VCS has objected to the taking of all items of evidence, and in particular has objected to the disclosure to TI or anyone else of any of their Confidential Information, and have filed a Motion for Return of Illegally Seized Items and a First Amended Motion for Return of Illegally Seized Items; and

Whereas, the Court has taken these Motions for Return under advisement and has restrained the District Attorney's Office of Dallas County, as of 3:00 o'clock p.m. on June 27, 1985, from viewing or making any use of said computer programs seized from VCS that might have VCS Confidential Information included therein, until the parties could agree to a manner of disclosure that would protect said Confidential Information; and

Whereas, the representatives of VCS and their employees and the representatives of the Dallas County District Attorney's Office were unable to arrive at an agreement or joint order, but were agreeable, without waiving any objections to the search, seizure or review of said material, to have Robert L. Davis named as the Court's Expert to review such Confidential Information and make a report to the Court as directed by the Court; now

It is therefore ORDERED, ADJUDGED, AND DECREED that:

1. Robert L. Davis is hereby appointed as the Court's Expert to perform such duties and responsibilities as ordered by the Court in regard to any Confidential Information seized from VCS and presently in the possession of the Dallas County District Attorney's Office; and that

2. The above-referenced Motions for Return are hereby DENIED, except as to relief that may be granted in this Order; and that

3. Robert L. Davis review all computer tapes seized from VCS and alledged to have Confidential Information of TI included therein, said review to be made at the offices of the District Attorney of Dallas County, located at 2720 Stemmons Freeway, 400 Tower South, Dallas, Texas 75207; and that

4. This review be made in a confidential manner, with no disclosure of Confidential Information belonging to VCS and/or TI being made to anyone except under a further Order of this Court or a Court of Competent Jurisdiction; and that

EXHIBIT C—Continued

5. The search for TI Confidential Information on said computer tapes be made in accordance with the July 1, 1985 Computer Research Program attached hereto as Exhibit "A", with only such necessary deviations as suggested by Robert L. Davis and approved by this Court; and that

6. The objections to said search program, as stated in a letter of August 8, 1985 directed to this Court and signed by attorney S. Michael McColloch, are hereby DENIED; and that

7. Robert L. Davis review the computer tapes referred to herein for the specific purpose of identifying any unmodified Confidential Information of TI or any Confidential Information of TI that has been used and/or modified in VCS computer programs; and that

8. Any TI Confidential Information discovered shall be copied and retained at the District Attorney's Office in a sealed container without disclosure to anyone, until such time as a report is made to this Court, and this Court enters a Supplemental Order in relation to the use and/or disclosure of such material; and that

9. Robert L. Davis shall make no disclosure in the future of Confidential Information obtained in this search except as authorized by this Court or a Court of Competent Jurisdiction, or as authorized in any non-disclosure agreements between Robert L. Davis and VCS and TI.

It is so ORDERED on this the _____16_____ day of August, 1985.

THOMAS B. THORPE
Judge, 203rd Judicial District Court
Dallas County, Texas

656

EXHIBIT D

IN RE: SEARCH WARRANT OF § IN THE 203rd JUDICIAL
 MAY 15, 1985 § DISTRICT COURT
 (VOICE CONTROL SYSTEMS, § DALLAS COUNTY, TEXAS
 INC.) §

## ORDER

WHEREAS, Robert L. Davis was appointed as the Court's expert on August 16, 1985 for the purposes set forth in the Court's Order of August 16, 1985; and

WHEREAS, Robert L. Davis has completed his duties under said Order, and has filed his FINAL REPORT with the Court, a copy of which is attached hereto as Exhibit No. 1; and

WHEREAS, the Court has accepted this FINAL REPORT and has received Three Hundred and Four (304) documents described in the said FINAL REPORT, which are grouped and designated by the Court as Court's Exhibits A thru G, as follows:

 A (1) and A (2), consisting of One Hundred and Eight
 (108) FOR (Program Files)
 B, consisting of One Hundred and Eight (108) TXT (Text
 Files)
 C, consisting of Eighteen (18) FOR (Program Files)
 D, consisting of Eight (8) TXT (Text Files)
 E, consisting of Nine (9) FOR (Program Files)
 F, consisting of Fifty-Three (53) TXT (Text Files)
 G, consisting of Notes and Indexes used by Robert L.
 Davis, and

WHEREAS, Robert L. Davis has described the contents of the Three Hundred and Four (304) files in his FINAL REPORT; and

WHEREAS, it is necessary for the Court to enter an Order concerning the use and safe-keeping of the Court's Exhibits described herein; now

It is therefore ORDERED, ADJUDGED, AND DECREED that:

1. Court's Exhibits A (1), A (2) and B, containing Text and Program Files of Texas Instruments, Inc., origin, are hereby released to the District Attorney's Office of Dallas County, Texas, for investigation purposes, in order to determine if the Texas Penal Code has been violated, and to be used as evidence, if otherwise admissible, in the event that such a violation has occurred; in this connection, no public disclosure is to be made of said Court's Exhibits, except as may be necessary for investigation and prosecution purposes, or as provided by the Order of this Court or a Court of Competent Jurisdiction; and that

2. Court's Exhibits C and D, containing Text and Program Files, the origin of which is questionable, are hereby sealed and shall remain in the custody of the Court; and that

3. Court's Exhibits E and F, containing Text and Program Files sensitive to Voice Control Systems, Inc., are hereby sealed and shall remain in the custody of the Court; and that

4. Court's Exhibit G, containing Notes and Indexes used by Robert L. Davis in his work, are hereby sealed and shall remain in the custody of the Court; and that

EXHIBIT D—Continued

5. The District Attorney's Office of Dallas County, Texas is further restrained from retrieving and/or obtaining any information from the computer, computer tapes, and/or computer disks used by Robert L. Davis in obtaining the information contained in his FINAL REPORT, subject to a further Order of this Court; and that

6. A copy of this Order shall be served on Richard E. Zadina, Assistant District Attorney, Dallas County Texas, as the representative of the District Attorney's Office, and on S. Michael McColloch, attorney for Voice Control Systems, Inc., and they are hereby authorized to distribute copies of this Order, along with Exhibit No. 1 (the FINAL REPORT), to parties of interest.

It is so ORDERED on this the ___1st___ day of October, 1985.

THOMAS B. THORPE
Judge, 203rd Judicial District Court
Dallas County, Texas

CAUSE NUMBER F85-98689-FM

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE 194TH |
| VS. | § | JUDICIAL DISTRICT COURT |
| THOMAS BARTON SCHALK | § | DALLAS, COUNTY, TEXAS |

## PROTECTIVE ORDER

On the 7th day of February, 1986, came on to be heard the States's Motion for Protective Order, and after considering the same and after arguments of counsel, the Court being of the opinion that the same should be granted, it is therefore

ORDERED, ADJUDGED AND DECREED that any and all documents, manuals, computer disks, computer programs, magnetic tapes, computer software, computer data, and proprietary and trade secret information of Texas Instruments, Inc., or any copies thereof, which are tendered to the Defendant and his attorneys during pre-trial discovery in this case, are not to be disclosed or disseminated by them to anyone, save and except third-party experts (who agree to be bound by this protective order in writing) hired by said Defendant and his attorneys to participate in the trial of this case, witnesses or prospective witnesses in the trial of this case (who agree to be bound by this protective order in writing), and the investigators, secretaries and agents of said attorneys, and further, that no copies of said material be made by anyone granted access to it other than the Defendant's attorneys for trial preparation; and it is further

ORDERED, ADJUDGED AND DECREED that any of the above described material containing proprietary or trade secret information of Voice Control Systems, Inc., which is in the possession of the District Attorney's Office, shall not be disclosed or disseminated by staff members of the District Attorney's Office, to anyone; and it is further

ORDERED ADJUDGED AND DECREED that any and all of said items which are introduced into evidence in this case, be and are hereby SEALED, and shall not be open to public disclosure or public inspection, and further, that no public disclosure of any kind be made of said material by anyone with legitimate access to it.

Signed this the 12th day of February, 1986.

Ed Kinkeade
Judge Presiding

We the undersigned have read and fully understand the terms of this PROTECTIVE ORDER and agree to be bound by all of the provisions, limitations and restrictions set forth herein:

SIGNATURE DATE